**RUTLAND RAILWAY CORPORATION**

v.

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS,** Brotherhood of Locomotive Firemen and Enginemen, Brotherhood of Railroad Trainmen, Order of Railway Conductors and Brakemen et al.

**Civ. A. No. 3070.**

United States District Court

D. Vermont.

Oct. 26, 1960.

As Amended Nov. 17, 1960.

Thomas W. Lynch, Gen. Counsel of Rutland Railway Corp., Rutland, Vt., Donald L. Wallace (of Clark, Carr & Ellis), New York City, for plaintiff.

Harold N. McLaughlin (of Hornbeck, Knachel, McLaughlin & Ritter), Cleveland, Ohio, Philip H. Hoff (of Black, Wilson & Hoff), Burlington, Vt., Donald W. Fisher (of Mulholland, Robie & Hickey), Toledo, Ohio, for defendants.

GIBSON, District Judge.

This is an action brought by the Rutland Railway Corporation against Brotherhood of Locomotive Engineers; Brotherhood of Locomotive Firemen and Enginemen; Brotherhood of Railroad Trainmen; Order of Railway Conductors and Brakemen—all unincorporated associations; and against certain named individuals as chairmen of units in these associations.

The complaint was filed in this Court on September 26, 1960, and seeks a mandatory injunction directing and permanently enjoining any of the defendants from continuing an alleged wrongful and illegal strike on the plaintiff's railroad; seeking an order that the defendants comply with the procedural requirements of the Railway Labor Act, 45 U.S.C.A. § 151 et seq.; and for damage caused the plaintiff by this alleged unlawful strike.

The defendants filed an answer on October 17, 1960, taking their full twenty days in which to join issue. They also filed a counterclaim with their answer asking for a prohibitory injunction restraining the plaintiff from unilaterally placing into effect certain schedule changes posted by it on September 8, 1960, and directing the plaintiff to preserve the status quo with respect to the alleged proposed changes in working conditions.

### Findings of Fact.

A hearing was held at Windsor commencing October 20, 1960. This Court finds the following facts:

The plaintiff operates a railroad in interstate commerce. One subdivision, hereinafter called the Ogdensburg subdivision, runs between Ogdensburg, New York, and Alburg, Vermont. This subdivision has stations at Ogdensburg, Norwood and Malone, New York, and at Alburg, Vermont. This subdivision runs generally east and west.

The main line subdivision runs generally north and south. It runs from Alburg, Vermont, through Burlington, Rutland, and into North Bennington, Vermont. It also has a Bellows Falls subdivision running between Rutland and Bellows Falls, Vermont.

The plaintiff has existing agreements with each of the Brotherhood defendants. Its basic agreement on rates of pay and rules with the Order of Railway Conductors and Brakemen, the Brotherhood of Railroad Trainmen, and Brotherhood of Locomotive Engineers became effective March 18, 1949. Its basic agreements with the Brotherhood of Locomotive Firemen and Enginemen became effective as to rules February 16, 1951, and as to rates of pay September 1, 1951. There have been several amendments to each of these basic agreements.

The year 1960 has been a poor one for the Rutland Railway. In its first eight months it had a decrease in money volume of better than $264,000 as compared to the first eight months of 1959. Its carload loss in these eight months was in excess of 5,300 cars of freight. Its loss for the month of July alone was in excess of $64,000.

This matter of loss of business and loss of income was discussed at a Directors meeting held at the end of May or early in June. Rearranged train schedules were then discussed as one means of cutting expenses. When June and July showed losses continuing, the management decided to cut off some freight trains and change its schedules.

Accordingly, on September 8, 1960, it posted notices which, in effect, abolished all existing trains on the Ogdensburg subdivision and created a new local freight daily running between Alburg and Ogdensburg and another daily local freight running between Ogdensburg and Alburg. The yard switchers at Alburg and Malone were to remain daily switchers. In effecting this change, the Railway abolished daily trains running between Alburg and Norwood and between Norwood and Alburg. Likewise it abolished a train leaving from Malone for Alburg, and returning, and a train leaving Malone for Ogdensburg, and returning.

On its main line subdivision it abolished a through daily freight train from Rutland to Alburg and Alburg to Rutland, leaving a daily local freight train each way between Alburg and Rutland.

On the Bellows Falls subdivision it abolished one through freight train running between Rutland and Bellows Falls, leaving one local freight train running between Rutland and Bellows Falls daily.

Actually, it reduced the number of train runs by two—from six to four—on the Ogdensburg subdivision. The effect of this was to reduce the number of employees on that subdivision from thirty to twenty.

Meanwhile, sometime in August, 1960, the defendant Brotherhoods, being desirous of increased pay, made this desire known to Management. When Management indicated it couldn't grant this, a negotiation on this was set up for August 30th and representatives of the International Brotherhoods arrived to participate in this negotiation.

At this meeting of August 30th, at which Management and the Brotherhoods were present, representatives of the Brotherhoods made their demands known. The President of the plaintiff corporation replied in substance that it was impossible to meet these demands because of the financial condition of the plaintiff but he suggested that if certain rules were changed, great savings would be effected and then pay increases might be feasible.

After considerable discussion, the following specifics were suggested by the plaintiff:

1. Eliminate all arbitraries.

2. Open closed yards—the only closed yard on this property is Rutland yard, closed to trainmen (yardmen).

3. Dovetail rosters each craft, Vermont and New York divisions.

4. Make provisions for operating road switchers.

5. Provide for operation of trains between assigned terminals so that wage payments will equal the miles run and/or an 8 hour day.

No meeting of the minds occurred and the conference broke up. On September 7, 1960, by letter, the General Chairman of Brotherhood of Railroad Trainmen served formal notice of the Brotherhood's desire to change the rates of pay and rules then in force. This letter was acknowledged by Management by letter dated September 12, 1960, agreeing in substance that the proposals contained in the letter of September 7th be referred to national handling together with Management's proposals of November 2, 1959.

By telegram received by the plaintiff the morning of September 14th, plaintiff was notified the Brotherhoods were to

strike as of 12:01 a. m. September 16 because "carrier cancelling 1957 and 1959 agreements by bulletins and changing home terminals and running thru former terminal for certain local freight crews". The plaintiff answered the same day as follows:

"Urtel Date Advising 'Withdrawal Of Employes Of Rutland Railway Represented By BLE ORC&B BRT And BLF&E Authorized As Of 12:01 AM Sept. 16, 1960 Account Carrier Cancelling 1957 And 1959 Agreements By Bulletins And Changing Home Terminals And Running Through Former Terminal For Certain Local Freight Crews If NMB Intervenes Or Proffers Services Strike Date Will Be Postponed Pending Mediatory Efforts Provided Carrier Observes Status Quo'. Rutland Railway Corporation Effective Sept. 17, 1960 Will Arrange Train Assignments To Conform To The Demands Of Traffic. The Change Is Not And Cannot Be Shown To Have Violated Any Rule Or Agreement As Alleged. No Agreement Has Been Violated And The Carrier Is Merely Exercising Its Right To Operate In An Economical Manner. Conferences On This Issue Have Not Been Held On The Property With The Organizations Herein Referred To. Carrier Respectfully Points Out That The NMB Is Without Authority To Direct Methods Of Operation When No Rule Has Been Violated. The Actions Of The BLE ORC&B BRT And BLF&E In Authorizing Withdrawal Of Employes Represented By Them As Of 12:01 AM Sept. 16, 1960 Is Regarded As Being Illegal And In Violation Of The Provisions Of The Railway Labor Act. Carrier Again Assures NMB Status Quo Being Observed In Mediation Case No. A Dash 6329 And Accordingly Has Not Changed Or Cancelled Nor Does It Intend To Change Or Cancel Agreements Pending Mediation Of Case No. A Dash 6329."

The Brotherhoods went on strike as scheduled.

There is another facet to this dispute. On November 2, 1959, the plaintiff caused to be served on the defendants what are known Sec. 6 notices under the Railway Labor Act. These are entitled "Basis of Pay and Assignment of Employees" and "Consist of Crews". These were referred by all parties for national handling. Defendants claim that by this notice, plaintiff seeks to eliminate all agreements which in any way

" * * * prohibit or impose restrictions on the right of the carrier to establish, move, consolidate or abolish crew terminals, * * * "

or

" * * * prohibit or provide penalties for running crews through established crew terminals * * "

and to conclude a new agreement that the carrier shall have the right to

" * * * establish, move, consolidate and abolish crew terminals * * * with the right to operate any such run * * * through established crew terminals * * * "

On November 30, 1959, a conference was held to discuss the meaning of these Sec. 6 notices. The General Chairman, Mr. Esposito, asked many questions as to these notices and wrote down his version of Management's answers thereto.

Conferences are still pending on these Sec. 6 notices.

However, on September 29, 1960, the plaintiff submitted its position on its schedule changes to the National Railroad Adjustment Board for adjudication. The Board has accepted this submission, filed it, and ordered the defendants to answer.

Since January 1, 1953, on the Ogdensburg subdivision, there have been thirty-two changes of train runs or schedules instituted by the plaintiff. With one or two exceptions, none of these changes were held up pending negotiations between plaintiff and defendants. It is probably true that in some instances verbal complaint was made by some of

the defendants to some representative of Management. However, the making of an oral complaint is not in itself a negotiation.

It is true that witness Stone for the Order of Railway Conductors and Brakemen testified that most of these thirty-two changes were negotiated. He had no notes or memo of these events, some of which happened as many as seven and one-half years ago. There were no records in the Railway files indicating any such negotiations. This Court was not impressed with Mr. Stone's testimony. As noted previously, no doubt many verbal complaints were made when changes were posted. Changes of any kind almost invariably draw some complaints. But a complaint does not indicate there were negotiations when these thirty-two notices of changes of train runs or schedules were posted.

As to the Agreements on Rates of Pay and Rules in effect on September 16, 1960, I find—amongst others—certain rules governing when it is decided train runs will be established, abolished or reductions in force are to be made. See arts. 31, 39 of the agreement with Conductors and Trainmen; art. XXXVII of the Locomotive Engineers agreement; and arts. 39 and 51 of the Locomotive Firemen and Enginemen agreement.

I also find rules pertaining to points for beginning and ending day. See art. 16—Conductors and Trainmen; art. 17 in the other agreements.

I find nothing in any of these agreements expressly restricting Management in any way as to the number of employees that must be maintained or the number of trains it must run.

Neither is there any language in any of these agreements expressly requiring the carrier to operate trains from any specific terminal. Nor is there any requirement expressed in these agreements which in any way restricts the carrier from adding or abolishing train runs based on operational requirements unless prior approval or consent is obtained from the Brotherhoods.

All of the contentions of the defendants turn upon the interpretation and application of the relevant provisions of the collective bargaining agreements.

The Rutland Railway, on September 15, 1960, had roughly four hundred employees. It is highly probable that as a result of the new proposed schedules, eight employees who live in the Malone and Norwood areas will face some financial loss and some disruption of their normal family life.

### Conclusions of Law.

1. A dispute between railroad unions and carrier growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions must be negotiated and may be referred by petition of the parties or by either party to the appropriate division of the National Railroad Adjustment Board. An award of the Adjustment Board is final and binding upon both parties to the dispute, except insofar as it contains a money award. Railway Labor Act, Secs. 2, Second, 2, Sixth, 3, First (i), 3, First (m). A dispute between railroad unions and carrier concerning an intended change by either party in agreements affecting rates of pay, rules, or working conditions is only subject to mandatory notice, negotiation, and mediation procedures. Railway Labor Act, Secs. 2, Second, 2, Seventh, 5, 6. The former type of dispute is denominated minor and the latter is denominated major. Elgin, Joliet & Eastern Railway Co. v. Burley, 1945, 325 U.S. 711, 722–724, 65 S.Ct. 1282, 89 L.Ed. 1886.

2. The issue in dispute between the four operating Brotherhoods and the carrier in this litigation is whether or not the carrier had unilateral power as of September 8, 1960, to abolish and establish train runs with consequent reduction in the number of train runs, reduction in work force, and movement of a terminal for going on and off duty.

3. The dispute affects working conditions so that it must be either a minor

or major dispute under the Railway Labor Act.

4. The dispute grows out of a conflict over the interpretation and application of the provisions in the collective bargaining agreements pertaining to advertising of job vacancies, reduction of forces, and point for beginning and ending day. See, e. g., Norfolk & Portsmouth Belt Line Railroad Company v. Brotherhood of Railroad Trainmen, 4 Cir., 1957, 248 F.2d 34, certiorari denied, 1958, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed. 2d 274 (dispute over unilateral authority of carrier to establish additional point for going on and off duty was minor); Missouri-Kansas-Texas Railroad Company v. Brotherhood of Locomotive Engineers, 5 Cir., 1959, 266 F.2d 335, reversed on other ground, 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (dispute over unilateral authority of carrier to reschedule train runs and change home terminals with reduction in work force of ten was minor).

5. The facts that the carrier gave a Section 6 notice to its operating Brotherhoods on November 2, 1959, regarding a proposed new agreement to confirm its alleged unilateral authority under the existing agreements to abolish, establish, and move crew terminals, and that conferences on this proposed new agreement had not been terminated on September 8, 1960, do not extinguish the underlying minor dispute or preclude submission of it to the Adjustment Board. See In Hudson & Manhattan Railroad Company, D.C.S.D.N.Y.1959, 172 F.Supp. 329, affirmed sub nom. Stichman v. General Grievance Committee of Brotherhood of Railroad Trainmen, 2 Cir. 1959, 267 F.2d 941, certiorari denied, 1960, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727. Nor should these facts be deemed to stay the underlying minor dispute until major dispute procedures are exhausted.

6. Considerable weight is attached by the defendants to Butte, Anaconda & Pacific Railway Company v. Brotherhood of Locomotive Firemen and Enginemen, 9 Cir., 1959, 268 F.2d 54, certiorari denied, 1959, 361 U.S. 864, 80 S.Ct. 1240, 4 L.Ed.2d 104. The dispute started by a Section 6 notice in that case was strictly a major one because the carrier was seeking to amend two provisions of existing agreements. Therefore, the decision is not pertinent.

7. The defendants also rely on Order of Railroad Telegraphers v. Chicago & North Western Railway Co., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774. That case establishes that where carrier or union chooses to make a major dispute out of a minor one under the Railway Labor Act, the other party cannot simultaneously treat the dispute as minor. In this litigation, the same party that elected to treat an aspect of a minor dispute as major has decided to pursue the entire minor dispute in its true character. The Telegraphers case should be confined narrowly to its facts. See Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Columbia L.Rev. 381, 394–397 (1960).

8. The carrier having referred the minor dispute to the first division of the National Railroad Adjustment Board, the strike of the four operating Brotherhoods is illegal under the Railway Labor Act and the four operating Brotherhoods must be enjoined from any further use of economic coercion in this dispute in order to preserve the jurisdiction of the Adjustment Board as compulsory arbitrator. See Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad Company, 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, and Manion v. Kansas City Terminal Railway Company, 1957, 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed. 2d 722. Such an injunction may be circumscribed by conditions which are necessary to do justice between the parties. Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed. 2d 1379.

### Judgment Order.

The defendant unions, their members, and agents are enjoined as of 12:01 a. m. Thursday, October 27, 1960, from further striking, picketing, or using any

other form of economic coercion in connection with the dispute submitted to the National Railroad Adjustment Board by the Rutland Railway Corporation on September 30, 1960. This injunction shall remain in effect until the dispute is disposed of by the Adjustment Board. It is issued because the dispute leading to the strike is minor under the Railway Labor Act and the strike became illegal upon submission of the minor dispute to the Adjustment Board for compulsory arbitration.

The plaintiff is ordered to post a bond in the sum of $10,000 as security on the injunction.

Trial of the issue of damages for this illegal strike will be held at a later date.

Defendants' counterclaim is denied.