**RUTLAND RAILWAY CORPORATION,**
Plaintiff-Appellee,

v.

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS et al., Defendants-Appellants.**

**No. 259, Docket 26760.**

United States Court of Appeals
Second Circuit.

Argued March 8, 1962.

Decided June 18, 1962.

Marshall, Circuit Judge, dissented.

Thomas Wm. Lynch, Rutland, Vt.
(Clark, Carr & Ellis, by Charles D. Peet,

**24**

Donald L. Wallace, Harry F. Martin, Jr., New York City, of counsel), for plaintiff-appellee.

Philip H. Hoff, Burlington, Vt., Harold N. McLaughlin, Harold A. Ross, Cleveland, Ohio, Donald W. Fisher, Toledo, Ohio (Harold C. Heiss, Cleveland, Ohio, V. C. Shuttleworth, Cedar Rapids, Iowa, Wayland K. Sullivan, Cleveland, Ohio, Black, Wilson & Hoff, Burlington, Vt., Marshman, Hornbeck, Hollington, Steadman & McLaughlin, Cleveland, Ohio, of counsel), for defendants-appellants.

Before WATERMAN, KAUFMAN and MARSHALL, Circuit Judges.

WATERMAN, Circuit Judge.

The four appellant labor unions, the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, the Brother of Railroad Trainmen, and the Order of Railroad Conductors and Brakemen, hereinafter referred to collectively as the defendant brotherhoods, and the five individual appellants, each either a general or local chairman of one of the above-mentioned brotherhoods, appeal from a judgment order of the United States District Court for the District of Vermont, enjoining as of October 27, 1960, the unions, their members, and agents from further striking, picketing, or using any other form of economic coercion in connection with a dispute which the plaintiff Rutland Railway Corporation had submitted to the National Railroad Adjustment Board, the injunction to remain in effect until the Board had disposed of the dispute.

The strike began on September 16, 1960. It continued until the injunction order was effective. Then, obedient thereto, the workers went back to their jobs.

The Rutland Railway operations are divided into three subdivisions. One subdivision runs from the New Hampshire border at Bellows Falls, Vermont, to Rutland, Vermont, and is approximately 52 miles long. The main line subdivision runs northerly from the southwestern corner of the State of Vermont through North Bennington, Rutland, and Burlington, Vermont, to the northern tip of Lake Champlain at Alburg, Vermont, a distance of about 155 miles. At Alburg the road proceeds westerly across northern New York State through Malone and Norwood, New York, to Ogdensburg, New York, a distance of one hundred twenty-two miles. Malone is halfway between Alburg and Ogdensburg. Norwood, between Malone and Ogdensburg, is 35 miles from the former and 25 miles from the latter. The portion of the line from Alburg to Ogdensburg is called the Ogdensburg Subdivision.

On November 2, 1959, the Rutland Railway, which had been in financial difficulty, sent notices to the general chairmen of the four defendant brotherhoods, as the duly recognized representatives of the Rutland's operating employees, to inform the labor organizations that the carrier proposed, among other things, to change all existing agreements and rules which would prevent it from consolidating and abolishing crew terminals, merging seniority districts, and establishing interdivisional runs.[1] As part of a concerted country-wide effort to initiate national discussion of railroad problems most of the Class I carriers in the nation also delivered similar notices to brotherhood officers.

"ATTACHMENT A

\* \* \* \* \* \* \*

"ROAD TRAIN AND ENGINE SERVICE ASSIGNMENTS.

"A. Except as hereinafter provided, eliminate all agreements, rules, regulations, interpretations, and practices, however established, applicable to any class

---

[1]. The relevant part of the notices given by the Rutland were as follows:

"We hereby give notice, under our existing agreements and pursuant to the provisions of the Railway Labor Act, that effective January 1, 1960, we propose to revise and supplement such agreement or agreements in accordance with the proposal set forth in 'Attachment A' appended hereto.

The issuance of these notices was required by Section 6 of the Railway Labor Act, 44 Stat. 582 (1926), as amended, 45 U.S.C.A. § 156.[2] At the time these notices were sent the Rutland Railway had collective bargaining agreements with the brotherhoods.

On November 30, 1959, conferences between representatives of the Rutland and representatives of its employees were commenced in order to consider the proposals contained in the Section 6 notices sent November 2. The parties failed to reach agreement on any of the proposals, and the conferences were soon recessed. The railroad then delegated authority to the Carriers' Eastern Conference Committee to further confer on behalf of the Rutland, and the labor representatives delegated their authority so to do to the National Conference Committee of the four brotherhoods.[3]

or grade of road train or engine service employees, which

"(i) prohibit or impose restrictions on the right of the carrier to establish, move, merge or consolidate seniority districts,

"(ii) prohibit or impose restrictions on the establishment or operation of inter-divisional, inter-seniority, district, intra-divisional or intraseniority district runs.

"(iii) prohibit or provide penalties for running crews through established crew terminals, or

"(iv) provide for automatic release of crews upon arrival at terminals or end of run, or when off of assigned territory.

"B. Establish a rule to provide that

"1. The carrier shall have the right to establish, move, consolidate and abolish crew terminals, to merge and consolidate seniority, districts, and to establish inter-divisional, interseniority district, intradivisional and intraseniority district runs in assigned and unassigned service with the right to operate any such run, whether assigned or unassigned (including extra service), on either a one way or turn-around (including short turn-around) basis and through established crew terminals. * * *

"2. No rule, regulation, interpretation or practice, however established shall be construed to in any way prohibit, restrict or limit the provisions of paragraph 1 of this rule except as provided in sub-paragraphs (a) and (b) of this paragraph 2. * * * * * * *

"(b) Before a run is established under the provisions of this rule which the carrier does not now have the right to establish without agreement with its employees, and which involves both the establishment of a new home terminal for the class of service involved and operation through an established crew terminal or terminals for such class of service, the carrier shall give notice to the general chairman * * *

"3. All agreements, rules, regulations, interpretations and practices, however established, which conflict with the above shall be eliminated, except that existing rules and practices considered by the carrier to be more favorable are preserved."

2. The section reads:

"Sec. 6. Carriers and representatives, of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has, been finally acted upon, as required by section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

3. The representatives of the employees countered with proposals of their own, served by a Section 6 notice on September 7, 1960. National conferences, on these controversies were suspended when the Presidential Railroad Commission was established on November 1, 1960. The President authorized and directed the Commission "to investigate and to inquire into the issues raised by the proposals of the parties involved in the above-mentioned controversy, with the objective of making a report to the President, including its findings and recommendations with respect to the controversy, and assisting in achieving an amicable settlement and agreement with respect to issues in dispute between the parties." The Commission rendered its report and recommendations on February 28, 1962.

The Rutland's financial plight continued to worsen. In the first eight months of 1960 it was hauling 5300 carloads of freight less than it was hauling in the comparable period of 1959. Its operating revenues were $264,000 less than those of the same period in 1959. Therefore the railroad's board of directors met in the spring and summer of 1960 in order to devise methods for combatting the company's financial problem. A plan was finally agreed upon whereby certain operating expenses would be reduced by the abolition of several freight runs.

On its Ogdensburg Subdivision, which stretched from Alburg, Vermont, to Ogdensburg, New York, the Rutland had operated a total of four freight trains and two yard switchers. From east to west on the Ogdensburg Subdivision, there were terminals at Alburg, Vermont; Malone, New York; Norwood, New York; and Ogdensburg, New York. Two of these trains operated daily in opposite directions between Alburg and Norwood. The two other trains operated out of Malone, one going to Ogdensburg and returning each day, the other going to Alburg and returning each day. Pursuant to the decision of its directors to reduce the number of freight runs, the railroad posted bulletins on September 8, 1960, announcing that beginning September 17 the four existing daily freight runs on the Ogdensburg Subdivision were to be replaced by two, running daily between Alburg and Ogdensburg in opposite directions. This new schedule would reduce the number of jobs on the subdivision by ten and would change the home terminals of some of the trainmen whose jobs were not eliminated.

On September 14 the railroad learned that its employees would strike in an attempt to prevent these new schedules from becoming effective. On the morning of September 15 the brotherhoods, obviously referring to the schedule changes on the Ogdensburg Subdivision, telegraphed the railroad that they would go on strike at 12.01 A. M., September 16 because "carrier cancelling 1957 and 1959 agreements by bulletins and changing home terminals and running thru former terminal for certain local freight crews." The railroad replied in part as follows:

"Rutland Railway Corporation effective Sept. 17, 1960 will arrange train assignment to conform to the demands of traffic. The change is not and cannot be shown to have violated any rule or agreement as alleged. No agreement has been violated and the carrier is merely exercising its right to operate in an economical manner. Conferences on this issue have not been held on the property with the [brotherhoods]."

The operating employees punctually struck at the time indicated by the brotherhoods' telegram that the strike would begin.[4]

---

As yet, no agreement between labor and management has been reached on the railroads' proposals to change all rules preventing consolidation of crew terminals, merger of seniority districts and establishment of interdivisional runs.

4. Meanwhile, another dispute was raging between the Rutland Railway and its employees. This second dispute was only tangentially related to the dispute spelled out in the text. In August 1960 the brotherhoods asked for pay increases for the employees whom they represented. A conference to negotiate this dispute convened on August 30, eight days prior to the September 8 bulletin. The president of the railroad explained to the labor representatives that the financial condition of the carrier made it impossible for management to meet the wage demands of the unions but he stated that if certain rule changes were agreed to by the unions the savings from these changes might permit increases in pay. The changes proposed by the railroad were these:

1. Eliminate all arbitraries.
2. Open closed yards—the only closed yard on this property is Rutland yard, closed to trainmen (yardmen).
3. Dovetail rosters, each craft, Vermont and New York divisions.
4. Make provisions for operating road switchers.
5. Provide for operation of trains between assigned terminals so that wage

Ten days later, on September 26, the railroad filed a complaint in the United States District Court for the District of Vermont, asking the court to enjoin a further strike, to order the defendants to comply with the procedural requirements of the Railway Labor Act, and to award damages to the plaintiff.

To support its claim for an injunction the railroad, defining the disagreement with its employees to be whether the management of the railroad had the right to rearrange train runs and thereby reduce jobs and change crew terminals without first negotiating the matter with the representatives of its workers, promptly submitted the dispute to the National Railroad Adjustment Board under the "minor dispute" provisions of the Railway Labor Act, §§ 2 Second, Sixth, 3, 44 Stat. 577, 578 (1926), as amended, 45 U.S.C.A. §§ 152 Second, Sixth, 153. On October 7 the defendants moved to dismiss the action because of improper venue. This motion was denied on October 10. The defendants then answered, and filed a counterclaim in which they on their part sought an injunction preventing the railroad from putting into effect the schedule of changes set forth in its bulletins of September 8 until at least the relevant procedures provided by the Railway Labor Act should have been exhausted.

After holding hearings on the merits of the respective claims the district court issued an injunction enjoining the strike. A consideration of the railway's prayer for an award of damages was postponed to a later date. In its opinion, reported at 188 F.Supp. 721 (D.Vt.1960), the court held that the dispute out of which the strike arose was a minor one, subject to the jurisdiction and decision of the National Railroad Adjustment Board and that the Section 6 notice of November 2, 1959, sent out by the Class I railroads on the national level did not alter the minor nature of this particular dispute over the rescheduling of freight runs. The court did not grant the defendants' prayer for an injunction to prevent the railroad from effectuating its rescheduling. The defendants appeal to this court, seeking review of the district court decision adverse to them.

The appellants contend that the venue for this action was not properly located in the District of Vermont; that the controversy out of which this litigation arose was not a "minor dispute" as the court below held, but a "major dispute" under the Railway Labor Act, 44 Stat. 577 (1926) as amended, 45 U.S.C.A. §§ 151–163, and that the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C.A. §§ 101–115, deprived the court of jurisdiction to enjoin the strike. The appellee railroad asserts, on the other hand, that the court below was correct in determining the dispute a minor one which permitted the carrier to proceed with its schedule changes and required that the employees desist from striking.

### VENUE

Three of the defendant brotherhoods, the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, and the Brotherhood of Railroad Trainmen, have their headquarters at Cleveland, Ohio. The headquarters of the fourth brotherhood,

---

payments will equal the miles run and/or an 8 hour day.

The brotherhoods contended at the district court hearing that a spokesman for the management explained that change No. 5 meant the running of trains through established home terminals, but the district court refused to make such a finding. The August 30 conference ended without success. On September 7, 1960 (see footnote 3), the general chairman of the Brotherhood of Railroad Trainmen served a Section 6

notice on the railroad asserting that the brotherhood desired to change existing rates of pay and rules. On September 12, the railroad agreed to submit the union's proposals to national bargaining under the auspices of the National Mediation Board. A National Mediator came to Rutland to mediate this dispute over future wages. There was testimony at the hearing that the Mediator's work did not relate to the dispute over the bulletined changes in train schedules on the Ogdensburg Subdivision.

Order of Railway Conductors and Brakemen, are at Cedar Rapids, Iowa.

Inasmuch as this action arises under the laws of the United States, namely, the Railway Labor Act, the relevant venue provision of the Judicial Code is 28 U.S.C. § 1391(b):

"(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, except as otherwise provided by law."

The brotherhoods assert that, since they are unincorporated associations, the proper venue for an action against any one of them is only in the judicial district where its principal place of business is situated.

In Sperry Prods., Inc. v. Association of Am. R. Rs., 132 F.2d 408 (2 Cir. 1942), cert. denied, 319 U.S. 744, 63 S.Ct. 1031, 87 L.Ed. 1700 (1943), involving the venue provision for patent infringement actions, Judge Learned Hand discussed the concept of venue as it related to unincorporated associations. The venue statute there involved, 35 Stat. 1084 (1909), 28 U.S.C. § 109 (1940) (now 28 U.S.C. § 1400(b) (1958)), stated that any suit for patent infringement might be brought "in the district of which the defendant is an inhabitant, or in any district in which the defendant * * * shall have committed acts of infringement and have a regular and established place of business." Judge Hand stated that for venue purposes, as well as for other procedural incidents, an unincorporated association should be considered a jural entity, cf. United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), and that the only practical approach to the procedural problems created by actions involving unincorporated associations was to assimilate their treatment to that accorded corporations. Therefore, Judge Hand concluded that an unincorporated association should be considered "present" wherever it was continuously carrying on a substantial part of its activities, since this was the standard for the "presence" of corporations. However, he hastened to add that being "present" in a district was not tantamount to being an "inhabitant" of that district. Again assimilating the situation of the unincorporated entity which has no place of incorporation to that of the incorporated entity, Judge Hand announced that the unincorporated entity was an "inhabitant" of the district of its principal place of business.

Although Sperry Prods., Inc. involved the venue provision for patent infringement actions, courts have applied Judge Hand's reasoning in that case to the determination of questions that have arisen involving the general venue statute. Until the revision of the Judicial Code in 1948 there was little difficulty in so doing because the general venue statute, 28 U.S.C. § 112 (1940), provided only that "no civil suit shall be brought in any district court against any person * * * in any other district than that whereof he is an inhabitant * * *." Thus Judge Hand's discussion of where an unincorporated association was an inhabitant was applicable with equal force under the general venue provision as it then existed. See Brotherhood of Locomotive Firemen, etc. v. Graham, 84 U.S. App.D.C. 67, 175 F.2d 802 (1948), rev'd on other grounds, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949). Cf. Darby v. Philadelphia Transp. Co., 73 F.Supp. 522 (E.D.Pa.1947). But see Thermoid Co. v. United Rubber Workers, 70 F.Supp. 228 (D.N.J.1947). But in 1948 the general venue statute was redrafted as 28 U.S.C. § 1391; and a subsection (c) was added. This subsection stated:

"(c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as

the residence of such corporation for venue purposes." [5]

Under the venue provision drafted in 1948 courts were faced with the question whether they should follow Judge Hand and hold that an unincorporated association resides only at its principal place of business, or whether the process of assimilation which Judge Hand advocated should be extended by assimilating the treatment of unincorporated associations for venue purposes with the newly expanded concept of corporate residence.

The cases are divided on this issue. Some courts have held that for determining venue an unincorporated association resides only at its principal place of business. Brotherhood of Locomotive Firemen, etc. v. Graham, supra; McNutt v. United Gas Workers, 108 F.Supp. 871, 875 (W.D.Ark.1952); Griffin v. Illinois Cent. R. R., 88 F.Supp. 552, 555 (N.D. Ill.1949); Salvant v. Louisville & N. R. R., 83 F.Supp. 391, 396 (W.D.Ky.1949); Cherico v. Brotherhood of R. R. Trainmen, 167 F.Supp. 635 (S.D.N.Y.1958). Cf. Hadden v. Small, 145 F.Supp. 387 (N.D.Ohio 1951). Other courts have held that an unincorporated association may be sued in any district in which it is doing business. Portsmouth Baseball Corp. v. Frick, 132 F.Supp. 922 (S.D. N.Y.1955); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777 (S.D.N.Y.1958); Eastern Motor Express, Inc. v. Espenshade, 138 F.Supp. 426 (E.D.Pa.1956). And the Supreme Court has not yet spoken on the matter.

■ Venue in the federal courts is not a jurisdictional concept. See 28 U.S.C. § 1406(b) (1958); H.R.Report 308, 80th Cong., 1st Sess. A154 (1947) (Reviser's Notes). We should not think about it in the metaphysical terms which have often been associated with considerations of jurisdiction. Venue is a concept of convenience. See Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167–168, 60 S.Ct. 153, 84 L.Ed. 167 (1939); Cohen v. Commodity Credit Corp., 172 F.Supp. 803 (W.D.Ark.1959); Jacobson v. Indianapolis Power & Light Co., 163 F.Supp. 218 (N.D.Ind.1958); The North River, 57 F.Supp. 808 (E.D. N.Y.1944); Vogel v. Crown Cork & Seal Co., 36 F.Supp. 74 (D.Md.1940). It should be treated in practical terms. See Sperry Prods., Inc. v. Ass'n of Am. R. Rs., supra; American Airlines v. Air Line Pilots Ass'n, supra. Congress has stated in § 1391(c) that the residence of a corporation for venue purposes is not only in the state wherein it is incorporated but also in the places where it is licensed to do business and where it is doing business. It is true that we would be reading into 28 U.S.C. § 1391(c) words which are not there if we should assert that that subsection states that it applies to unincorporated associations. See Cherico v. Brotherhood of R. R. Trainmen, supra. But we do not find any manifestation here of a congressional policy of *expressio unius est exclusio alterius,* and so we follow the reasoning in Sperry Prods. and assimilate the residence of unincorporated associations under 28 U.S.C. § 1391(b) to that of corporations, 28 U.S.C. § 1391(c). Since the residence of a corporation for venue purposes has been expanded to include all the judicial districts in which the corporation is doing business, the residence of an unincorporated association for venue purposes should likewise be expanded to include all the judicial districts in which the unincorporated entity is doing business. We believe this accords with the practical requirements of litigation involving unincorporated associations. If an unincorporated union is carrying on sufficient activities in a particular judicial district so that it is deemed to be doing business there, it usually will suffer no undue hardship if required to stand suit there. If in certain instances the defense of a suit in a particular dis-

---

5. Another difference between the new statute and the old one was that the new one spoke in terms of "residence" instead of "inhabitance"; but it is clear from the Reviser's Notes to § 1391 that the two terms were intended to be synonymous. H.R.Report 308, 80th Cong., 1st Sess. A147 (1947).

trict is peculiarly oppressive, the association may always seek a transfer of the action under 28 U.S.C. § 1404(a) (1958).

■ Turning to the case before us, we hold that the defendant brotherhoods were doing business in the District of Vermont. They set up and maintained grievance committees and other facilities among the employees of the Rutland Railway in Vermont. They organized a strike of railroad employees in Vermont. They negotiated with the management of the plaintiff railroad in Vermont. Therefore, we conclude that venue for this action in the District of Vermont was proper and we affirm the order of the court below denying the motions to dismiss.

### MINOR OR MAJOR DISPUTE

We think that there are only two general questions presented by the issues of labor law involved in this case. They are: First, is this a so-called "major" or "minor" dispute under the Railway Labor Act, 44 Stat. 577, as amended, 45 U.S.C.A. §§ 151–163 (1958)? Second, does the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C.A. §§ 101–115 deprive the district court of jurisdiction to enjoin the strike?

■ For either of these statutes to be operative, there must be first of all a "labor dispute." The Norris-La-Guardia Act, § 13(c), 47 Stat. 73, 29 U.S.C.A. § 113(c), defines a labor dispute as follows:

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Section 2 of the Railway Labor Act, 44 Stat. 577 (1926), 45 U.S.C.A. § 151a, sets out the disputes to which it applies as "all disputes concerning rates of pay, rules, or working conditions" and "all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." In Order of R. R. Telegraphers v. Chicago & N. W. R. R., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), the Supreme Court explicitly held that a labor dispute existed under the Norris-LaGuardia Act, and implied that one existed under the Railway Labor Act, when a railroad sought to close a number of its stations and thereby reduce employment. The Court stated:

"Plainly the controversy here relates to an effort on the part of the union to change the 'terms' of an existing collective bargaining agreement. The change desired just as plainly referred to 'conditions of employment' of the railroad's employees who are represented by the union. The employment of many of these station agents inescapably hangs on the number of railroad stations that will be either completely abandoned or consolidated with other stations. And, in the collective bargaining world today, there is nothing strange about agreements that affect the permanency of employment. The District Court's finding that '[c]ollective bargaining as to the length or term of employment is commonplace,' is not challenged." Id. at 336, 80 S.Ct. at 764.

Numerous other courts have assumed the presence of labor disputes in similar situations. E. g., Hilbert v. Pennsylvania R. R., 290 F.2d 881 (7 Cir.), cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961); In the Matter of Hudson & M. R. R. Co., 172 F.Supp. 329 (S.D.N.Y.), aff'd sub nom. Stichman v. General Grievance Comm. of the Bhd. of R. R. Trainmen, 267 F.2d 941 (2 Cir., 1959), cert. denied, Hatler v. Dawson, 361 U.S. 928, 80 S.Ct. 385, 4 L.Ed.2d 351 (1960). Cf. Butte A. & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54 (9 Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959). The court below was correct when it found that a labor dispute relating to

working conditions existed when the case was heard on October 20, 1960.

In order to avoid interruptions to transportation resulting from disputes over rates of pay, rules, or working conditions, to provide peaceful and orderly procedures for the settlement of these disputes, and to foster the organization of employees, 44 Stat. 577 (1926), 45 U.S.C.A. § 151a, the Railway Labor Act was passed in 1926. 44 Stat. 577, as amended, 45 U.S.C.A. §§ 151–163 (1958). The Act contemplates two types of disputes, major and minor, and provides different procedures for handling each. See Railway Labor Act § 2, 44 Stat. 577 (1926), 45 U.S.C.A. § 151a, Hearings on H.R. 7650, before House Committee on Interstate Commerce, 73d Cong., 2d Sess. (1934); Hearings on S. 3266, before Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. (1934). Mr. Justice Rutledge in his oft-quoted opinion for the Court in Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), explained the distinction between major and minor disputes under the Railway Labor Act:

"The first [major dispute] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

"The second class [minor disputes], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employ-ment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future." Id. at 723, 65 S.Ct. at 1290.

See also Hearings on H.R. 7650, before House Committee on Interstate Commerce, 73d Cong., 2d Sess. 47 (1934).

▇▇▇▇ In both types of disputes the Act requires that, as a first step, the parties must make every reasonable effort to settle their differences in conference. § 2 First, Second, 44 Stat. 577 (1926), as amended, 45 U.S.C.A. § 152 First, Second. Elgin, J. & E. Ry. v. Burley, supra at 724–725 and nn. 12, 18, 65 S.Ct. supra at 1290–1291. Major disputes commence with the issuance of a notice known as a "Section 6 notice," given by the party seeking to change existing agreements. §§ 2 Seventh, 6, 44 Stat. 577, 582 (1926), as amended, 45 U.S.C.A. §§ 152, Seventh, 156. In major disputes, if settlement cannot be reached in conference, the matter is referred to mediation under the auspices of the National Mediation Board. § 5, 44 Stat. 580 (1926), as amended, 45 U.S.C.A. § 155. If mediation fails, the Mediation Board proposes voluntary arbitration to the parties, §§ 5, 7, 44 Stat. 580, 582 (1926), as amended, 45 U.S.C.A. §§ 155, 157, a course of action neither party is required to adopt. Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944). Finally, if the President of the United States desires, he is empowered to set up an emergency board to investigate and report to him with respect to the dispute. § 10, 44 Stat. 586 (1926), as amended, 45 U.S.C.A. § 160. The parties are required to comply with each stage in the above-described procedure before either may resort to self-help, and it is the statutory duty of the carrier not to alter rates of pay, rules, or working conditions, i. e., to maintain the status quo, until the Mediation Board has acted upon the dis-

pute. § 6, 44 Stat. 582 (1926), as amended, 45 U.S.C.A. § 156; see Burke v. Morphy, 109 F.2d 572 (2 Cir.), cert. denied, 310 U.S. 635, 60 S.Ct. 1078, 84 L.Ed. 1404 (1940). Grand International Bhd. of Locomotive Engineers v. Morphy, 109 F.2d 576 (2 Cir.), cert. denied, 310 U.S. 635, 60 S.Ct. 1078, 84 L.Ed. 1404 (1940). However, the Act does not create any tribunal having final authority to decide a major dispute without the consent of both parties, and in such disputes no provision in the Railway Labor Act prohibits the workers from striking as soon as all of the procedures for settling the dispute have been exhausted without a mutually satisfactory solution having been reached.[6]

■ The procedure under the 1926 Act for handling the other type of dispute (the minor dispute) soon proved ineffectual to produce peace in the railroad industry. Deadlock often resulted from the refusal by one side or the other to participate in the voluntary local boards which the Act contemplated as the source of decision in such disputes. Moreover, in many cases in which boards were established no decision could be reached because of the equal number of labor and management members on each board. These circumstances produced an ever-increasing backlog of unresolved disputes. See Hearings on S. 3266 before Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. 17, 137 (1934). To eliminate these roadblocks, the statute was amended in 1934 and the National Railroad Adjustment Board was created, making it unnecessary for the parties to set up local boards. § 3, 48 Stat. 1189 (1934), 45 U.S.C.A. § 153; H.R.Rep. No. 1944, 73d Cong., 2d Sess. 3;

S.Rep. No. 1065, 73d Cong., 2d Sess. 1, 2 (1934). Under this amendment, if the parties fail to agree in conference, either side may submit the matter to the National Railroad Adjustment Board. Procedures are provided for assuring that the Board will not become deadlocked, and unless the Board's decision contains a monetary award the decision of the Board is final and binding on the parties. § 3 subd. 1(i) (*l*) (m) (n), 48 Stat. 1189 (1934), 45 U.S.C.A. § 153 subd. 1(i) (*l*) (m) (n), see Union Pac. R. R. v. Price, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959). See generally Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L.J. 567 (1937). Thus a system of compulsory arbitration of minor disputes was created by the 1934 amendment. Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); California v. Taylor, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957). See Hearings on H.R. 7650 before House Committee on Interstate Commerce, 73d Cong., 2d Sess. 47, 58, 60, 81–82, 118 (1934); Hearings on S. 3266 before Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. 33, 35 (1934). To effectuate these procedures for the conclusive determination of minor disputes, courts have issued injunctions against strikes by the railroad unions. E. g., Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., supra; In the Matter of Hudson & M. R. R., 172 F.Supp. 329 (S.D.N.Y.), aff'd sub nom. Stichman v. General Grievance Comm. of the Bhd. of R. R. Trainmen, 267 F.2d 941 (2 Cir., 1959), cert. denied, 361 U.S. 928, 80 S.Ct. 385, 4 L.Ed.2d 351 (1960).[7]

6. Since the Railway Labor Act contains no provision to the contrary, the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C.A. §§ 101–115, operates to prevent the federal courts from enjoining strikes in major disputes, at least after the exhaustion of all of the procedures provided by the Railway Labor Act for settling such disputes. See Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R., 353 U.S. 30, n. 24, 77 S.Ct.

635, 1 L.Ed.2d 622 (1957); Brotherhood of R.R. Trainmen v. Toledo, P. & W. R.R., 321 U.S. 50, 64 S.Ct. 413, 88 L. Ed. 534 (1944); Order of R.R. Telegraphers v. Chicago & N. W. R.R., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960).

7. There is some doubt whether a federal court has power to issue an anti-strike injunction in a minor dispute before the

■ The defendants contend that the present controversy is a major dispute under the Railway Labor Act; and, therefore, their strike may not be enjoined, or, at least, may only be enjoined for the short period of time necessary for the exhaustion of mediation and the other major dispute procedures. The railroad, on the other hand, claims that this is a minor dispute; and, therefore, the strike must be enjoined so that the issue between the parties can be decided with finality by the Railroad Adjustment Board. We are called upon to decide whether this dispute is a major or a minor dispute, so that the parties then may go forward under the applicable set of procedures sanctioned by the Railway Labor Act. As Elgin, J. & E. Ry. v. Burley, supra, explained, the difference between major and minor disputes is that the former relate to new agreements or changes in existing contracts whereas the latter involve the interpretation and the application of existing agreements. We readily recognize that here, as in other areas of jurisprudence, the difference, on the one hand, between the interpretation and the application of an existing agreement, and, on the other hand, a change in an original intended basis of agreement is often a question of degree.

In reaching for resolution of this problem of course we must not place undue emphasis on the contentions or the maneuvers of the parties. Management will assert that its position, whether right or wrong, is only an interpretation or application of the existing contract. Unions, on the other hand, in their assertions about the dispute at issue, will obviously talk in terms of change. Since a Section 6 notice is required by the statute in order to initiate a major dispute, the labor representatives are likely to serve such a notice in any dispute arising out of any ambiguous situation so as thereby to make the controversy appear more like a major dispute. Compare Order of R. R. Telegraphers v. Chicago & N. W. R. R., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). Or they may seek to bring the particular conflict at issue within the bounds of an outstanding Section 6 notice that in reality does not relate to that dispute. See Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L. Rev. 381, 394–397 (1960).

■ But, on the other hand, we should not in the process of classifying this dispute as major or minor thereby also adjudicate the merits of the controversy between the parties. If this is a minor dispute, a decision on the merits of the dispute is the function of the National ·Railroad Adjustment Board; and if this is a major dispute the outcome of the parties' difference is to be determined by extra-judicial forces and procedures. See Order of Ry. Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Norfolk & P. B. L. R. R. v. Brotherhood of R. R. Trainmen, 248 F.2d 34 (4 Cir., 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958).

■ The disagreement between the Rutland Railway and its employees is not whether the train runs on the Ogdensburg Subdivision should be rescheduled, but, instead, whether the railroad has the unilateral right to make those changes without negotiating about them with the brotherhoods. Cf. Norfolk & P. B. L. R. R. v. Brotherhood of R. R. Trainmen, supra; Missouri-K.-T. R. R. v. Brotherhood of Locomotive Engineers, 266 F.2d 335 (5 Cir., 1959), reversed on other grounds, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960). Whether it be a major or a minor dispute, the disagreement is a dispute over the scope of the railroad's managerial prerogative. It is a major dispute if the present agree-

---

matter is submitted to the Railroad Adjustment Board. Cf. Manion v. Kansas City Terminal Ry., 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed.2d 722 (1957); Hilbert v. Pennsylvania R.R., 290 F.2d 881 (7 Cir.),

cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961). But inasmuch as the Rutland Railway has submitted the present controversy to the Board, we are not here faced with this problem.

ments between the railroad and the brotherhoods contain express provisions contrary to the position taken by the railroad or if the clear implication of these agreements is inconsistent with the railroad's proposals. It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous; and it is also minor if what the railroad seeks to do is supported by customary and ordinary interpretations of the language of the agreements.

The unions assert that the Section 6 notices of November 2, 1959, demonstrate that this is a major dispute. These notices were issued pursuant to national handling and similar notices were issued by most of the other Class I railroads in the country on the same day. Hilbert v. Pennsylvania R. R., 290 F.2d 881 (7 Cir.), cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961). Conferences over the changes referred to in those 1959 notices were still going on when the Rutland bulletined the new schedules for the Ogdensburg Subdivision in September 1960.

■ However, we note that the language in the Rutland's notices was not necessarily inconsistent with the railroad's present contention that it has the right under its existing agreements to change train schedules without negotiation. The November 2, 1959 notices set out a procedure for establishing new runs "which the carrier does not now have the right to establish without agreement with its employees * * *" The notices also state:

"3. All agreements, rules, regulations, interpretations and practices, however established, which conflict with the above shall be eliminated, except that existing rules and practices considered by the carrier to be more favorable are preserved."

The Seventh Circuit, faced with the same notices in Hilbert v. Pennsylvania R. R., supra, held that the railroad's November 2, 1959, Section 6 notices involved in that case did not turn a subsequent controversy over a proposed change in certain home terminals of the road into a major dispute. Cf. Pennsylvania R. R. v. Local 2013 of United R. R. Workers, 178 F. Supp. 53 (E.D.Pa.1959). We believe a similar situation exists in the case before us. The Section 6 notices created a major dispute, but the dispute so created was not the dispute over which the Rutland's employees went out on strike ten and one-half months later. Although there is an apparent similarity between the changes proposed in the notice given by the Rutland on November 2, 1959, and the schedule changes which the railroad later made unilaterally, the court below found that the railroad in making the September 1960 changes was not acting pursuant to the earlier notices. We cannot say that the district court was in error in so finding.

Butte, A. & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54 (9 Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959), relied upon by the defendants, is distinguishable from the present case. In that case the railroad issued Section 6 notices in which it first proposed to allocate certain ore loading formerly done by yard crews to main line crews, and, failing to reach agreement with the representatives of its workers thereon, it then proposed to reduce the size of the yard crews from five men to three men. Since this second proposal, too, was unacceptable, the railroad announced that the shipper would load its own ore. The shipper was Anaconda Copper Company, which conveniently happened to own all of the stock of the railroad. The railroad asserted that since the shipper, instead of the carrier, was going to load the ore, the road's dispute with its employees was at an end, and therefore the strike in which its employees were engaged should be enjoined. The court held that the major dispute commenced by the railroad's Section 6 notices continued, for the action taken by the copper company should be imputed to its wholly-owned subsidiary, the railroad. Thus the court there held that the Section 6 notices related to

the controversy throughout. That decision turned upon the specific facts in that case relating to the notices and the dispute. Similarly, in the present case, the significance of the Section 6 notices rests to a large extent on what the Rutland Railway intended when it issued the 1959 Section 6 notices and what the management and the employees intended when they subsequently became involved in the 1960 dispute. In the present case, upon a set of facts different from those in Butte, A. & Pac. Ry., we have concluded that the controversy created by the Rutland's Section 6 notices was not the same controversy over which its employees struck in September 1960.

The Rutland Railway points out several provisions in its agreements with the defendant brotherhoods which, the railroad contends, demonstrate that it had the right to act as it did. One such provision is Article 39(a) of its agreement with the Order of Railway Conductors and the Brotherhood of Railroad Trainmen:

> "(a) All vacant or new runs will be posted on the division on which they occur within five (5) days, to close within five (5) days, and to be assigned to the oldest bidder within ten (10) days, merit, fitness and ability to be considered. In case of men being away when run is advertised, when reporting for duty their claims to the run will be considered if a junior man has been assigned, if such claim, in writing, is made within five (5) days."

The language of Article XXXVII(a) in the carrier's agreement with the Brotherhood of Locomotive Engineers, and that of Article 39(a) in the agreement with the Brotherhood of Locomotive Firemen and Enginemen, is essentially the same as in the article quoted above. Also Article 39(e) in the agreement with the Conductors and Trainmen states:

> "(e) When established runs are changed to operate out of different terminals, schedules changed two (2) hours or more, twenty (20) miles or more, or the layover of such runs

changed, they will be considered new runs and bulletined as such."

The railroad also calls our attention to Articles 16 and 31 of its agreement with the Conductors and Trainmen, Articles 17 and 51 of the Brotherhood of Locomotive Firemen and Enginemen agreement, and Article XVII in the agreement with the Engineers. None of these provisions by themselves alone bestow upon the railroad the right unilaterally to change train runs and home terminals. But they are some indication that each agreement, taken as a whole, implicitly recognizes such a right in the carrier. As we said earlier in the opinion, the present controversy is over the extent of the railroad's managerial prerogative. The scope of the management's prerogative is often not spelled out in collective bargaining agreements, but the prerogative exists implicitly to some extent in all such agreements. See Cox & Dunlop, Regulation of Collective Bargaining by the National Labor Relations Board, 63 Harv.L.Rev. 389, 401 (1950); Gunther v. San Diego & Ariz. E. Ry., 198 F.Supp. 402, 408–411 (S.D.Cal.1961).

 The court below found that in general there had been no negotiation in the past between the Rutland and its employees over changes in train runs. This finding was not clearly erroneous. Across the nation there seems to be no uniform pattern in this matter; some railroads have more latitude to act unilaterally over changes of this sort than do others. See the Presidential Railroad Commission Report (Feb. 28, 1962) at 295.

In a number of cases involving disagreements similar to the one in the present case, courts have classified the disputes as minor. In the Matter of Hudson & M. R. R., 172 F.Supp. 329 (S.D.N.Y.), aff'd sub nom Stichman v. General Grievance Comm. of the Bhd. of R. R. Trainmen, 267 F.2d 941 (2 Cir., 1959), cert. denied Hatler v. Dawson, 361 U.S. 928, 80 S.Ct. 385, 4 L.Ed.2d 351 (1960), see also cert. denied, 363 U.S. 843, 80 S.Ct. 122, 4 L.Ed.2d 104 (revision of runs and use of multiple control cars

reducing trainmen jobs); Norfolk & P. B. L. R. R. v. Brotherhood of R. R. Trainmen, 248 F.2d 34 (4 Cir., 1957), cert. denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed. 2d 274 (1958) (change of point for reporting to work); Missouri-K.-T. R. R. v. Brotherhood of Locomotive Engineers, 266 F.2d 335 (5 Cir., 1959), reversed on other grounds, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) (changes in intradivisional runs and away-from-home terminals); Hilbert v. Pennsylvania R. R., 290 F.2d 881 (7 Cir.), cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1960) (reassignment of engineers from one terminal to another); Baltimore & O. R. R. v. United R. R. Workers, 271 F.2d 87 (2 Cir., 1959), vacated and remanded on other grounds, 364 U.S. 278, 80 S.Ct. 1609, 4 L.Ed.2d 1719 (1960) (abolition of post of oiler on diesel powered tugs).

 In the light of the provisions of the collective bargaining agreements, the prior conduct of the parties as found by the trial judge and the decisions in analogous cases, we hold that the existing agreements involved here, reasonably interpreted, may recognize implicitly a right in the railroad unilaterally to make the changes which it bulletined on September 8, 1960; therefore, we hold that the ensuing dispute must be viewed by the courts as a minor dispute. Whether the railroad does in fact have the rights it claims, or whether on further analysis it does not is for the Board to determine; on the *ultimate* resolution of this issue we express no opinion. We only hold that for the purpose of defining the extent to which a court may intervene and enjoin a strike the dispute in the present case is to be considered minor as one involving the interpretation of existing agreements.

Our decision is not inconsistent with the Supreme Court's holding in Order of R. R. Telegraphers v. Chicago & N. W. R. R., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed. 2d 774 (1960). Besides *concluding in* that case that a controversy over a railroad's proposal to reduce the number of its stations was a labor dispute under the Norris-LaGuardia Act, the Court held that that disagreement between management and labor involved a bargainable issue and that the controversy was a major dispute. We do not say that the issue in the present case is not a bargainable one. We have no doubt that the brotherhoods, upon the expiration of the existing agreements, may require the railroad to bargain over future procedures for changing train runs and schedules. We only hold that there is a sufficient indication that the existing agreements have preserved management's right unilaterally to make the schedule changes management intended to make so as to require that the dispute be submitted to the National Railroad Adjustment Board, as provided by the Railway Labor Act.

We are not entirely certain what constituted the basis in the Chicago & N. W. R. R. case for the Court's other conclusion that there a major dispute existed. Cf. Hilbert v. Pennsylvania R. R., 290 F.2d 881, 895 (7 Cir.), cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961). Probably the Court was applying the traditional standards for distinguishing the two types of disputes, and, on the facts presented to it in that case, concluded that a major dispute was present. On a different set of facts we have found a minor dispute here. But perhaps the Court in Chicago & N. W. R. R. was adding a new dimension to the usual criteria for distinguishing major disputes from minor ones, that of the magnitude of the effect on working conditions which would result from the proposal by the railroad. But even if the Court was adding this ingredient to its analysis, which we doubt, the controversy before us is still a minor dispute because the proposed schedule changes on the Ogdensburg Subdivision would only affect very few jobs.

 The court below did not condition its issuance of the injunction against appellants on a requirement that the railroad maintain the *status quo*. It was certainly within the court's power to impose such a condition. See Brother-

hood of Locomotive Engineers v. Missouri-K.-T. R. R., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) ; also United R. R. Workers, etc. v. Baltimore & O. R. R., 364 U.S. 278, 80 S.Ct. 1609, 4 L.Ed.2d 1719 (1960). But likewise it was in the court's discretion to decline to impose conditions. 363 U.S. at 534–535, 80 S.Ct. 1326, 4 L.Ed.2d 1379. We find no abuse by the court of its discretionary powers in this area.

### INTERRELATION OF THE RAILWAY LABOR ACT AND THE NORRIS-LA GUARDIA ACT

■ In general, the Norris-La-Guardia Act, 47 Stat. 70 (1932), 29 U.S.C.A. §§ 101–115, passed in 1932, deprives federal district courts of jurisdiction to issue injunctions against strikes by employees in labor disputes, § 4(a), 47 Stat. 71 (1932), 29 U.S.C.A. § 104(a) ; allows injunctions to be granted against unlawful acts which will cause irreparable injury only under strict procedural requirements, § 7, 47 Stat. 71 (1932), 29 U.S.C.A. § 107; and precludes injunctive relief even when these stringent requirements are met if the complainant has failed to fulfill, on its part, its legal obligations or has failed, on its part, to make reasonable attempts to settle the labor dispute by negotiation, mediation, or voluntary arbitration, § 8, 47 Stat. 72 (1932), 29 U.S.C.A. § 108. See 75 Cong. Rec. 4626, 4629 (1932) ; Chicago, R. I. & Pac. R. R. v. Switchmen's Union, 292 F.2d 61 (2 Cir., 1961), certiorari denied 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806. This statute embodies a policy of fostering the resolution of labor difficulties through the interplay of private forces unhampered by judicial interference. See S.Rep. No. 163, 72d Cong., 1st Sess. 18 (1932) ; H.R. Rep. No. 669, 72d Cong., 1st Sess. 3 (1932). The draftsmen of the Norris-LaGuardia Act had before them the 1926 provisions of the Railway Labor Act, which included most of the present procedures for settling major disputes, the provisions for disposing of minor disputes through voluntary local boards, and Sec-

tion 2 First and Second, 44 Stat. 577 (1926), 45 U.S.C.A. § 152 First and Second, which imposed on both management and labor the duty to confer over any dispute. All of these provisions channeled, but did not eliminate, the operation of private forces in the determination of labor disputes. See Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 58–59, 64 S.Ct. 413, 88 L.Ed. 534 (1944) ; cf. 75 Cong. Rec. 4505–10, 4618–26, 5462–515 (1932). Subsequent labor legislation, however, including the 1934 amendments to the Railway Labor Act which provided for official adjudication of certain labor disputes by the National Railroad Adjustment Board, reflected a policy of interpositioning greater governmental participation in labor relations. See Note, Accommodation of the Norris-LaGuardia Act to Other Federal Statutes, 72 Harv. L.Rev. 354, 356 (1958). To accommodate the differing policies underlying the Norris-LaGuardia Act and the Railway Labor Act is not an easy task. In Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), the Supreme Court stated:

> " * * * the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable."

On numerous occasions courts have issued injunctions in labor disputes despite the apparently categorical language of the Norris-LaGuardia Act. In Virginian Ry. v. System Fed'n 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), a labor union which had been certified by the National Mediation Board obtained an injunction against a railroad commanding the road to deal with it and not to interfere with the employees' choice of a bargaining representative. In a series of cases the Supreme Court has held that railroad unions may be en-

joined from showing discrimination in their representation of railroad employees. Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Graham v. Brotherhood of Locomotive Firemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). See also Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (arising in a state court where Norris-LaGuardia Act was inapplicable). See also Railroad Yardmasters of America v. Pennsylvania R. R., 224 F.2d 226 (3 Cir., 1953). See, generally, Chicago, R. I. & Pac. R. R. v. Switchmen's Union, supra; American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 785–787 (S.D.N.Y.1958).

■ In Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), the Supreme Court held that the Norris-LaGuardia Act did not preclude a federal court from enjoining a strike which might defeat the effectiveness of the National Adjustment Board's authority to adjudicate a minor dispute. The Court concluded first, that Congress had intended the proceeding before the Ad-

justment Board to be a reasonable substitute for self-help and second, that the earlier and more general language of the Norris-LaGuardia Act should give way to the later specific provisions of the 1934 amendments to the Railway Labor Act. For cases in which lower courts have enjoined strikes in such situations, see supra at p. 2092. In the present case, as in the Chicago River case, a minor dispute is involved, the railroad has submitted the matter to the Railroad Adjustment Board, and we follow the lead provided for us in that case and its progeny. We hold that an injunction is properly issuable in order to enforce compliance with the requirement of the Railway Labor Act that a minor dispute is to be heard and determined by the National Railroad Adjustment Board.[8] Cf. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457–459, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

■ But what significance for the case before us have Section 2 First, Second, and Sixth of the Railway Labor Act and Section 8 of the Norris-LaGuardia Act? Section 2 First and Second impose a duty on both parties to make every reasonable effort to settle a dispute, whether it be major or minor, and, as a part of their efforts, to confer over their differences.[9] Section 2 Sixth provides

---

**8.** In 1960 the Supreme Court again spoke on the relationship between the Norris-LaGuardia Act and the Railway Labor Act. Order of R. R. Telegraphers v. Chicago & N. W. R. R., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). The Court held that Section 4 of the Norris-LaGuardia Act withdrew jurisdiction from the federal court to enjoin the strike involved in that case. The Court discovered no provision of the Railway Labor Act which made the strike unlawful and concluded that there the dispute was a major one. That case is distinguishable from the present one for the labor dispute here is a minor dispute. The Supreme Court in Chicago & N. W. R. R., though holding that the strike there could not be enjoined, recognized that federal courts could enjoin strikes arising out of minor disputes. 362 U.S. at 341, 80 S. Ct. 761. Moreover, a strike which would frustrate the procedures created by the

Railway Labor Act for the final determination of such disputes would be unlawful. Cf. Chicago, R. I. & Pac. R. R. v. Switchmen's Union, 292 F.2d 61 (2 Cir. 1961), certiorari denied 370 U.S. 936, 82 82 S.Ct. 1578, 8 L.Ed.2d 806.

**9.** These sections provide in pertinent part:
"First. It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort * * * to settle all disputes, whether arising out of the application of such agreements or otherwise, * * *.
"Second. All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, and in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute."

the procedure for calling a conference to discuss a minor dispute. These conferences are to take place before a submission of the dispute to the Railroad Adjustment Board. § 3 First (i), 48 Stat. 1189 (1934), 45 U.S.C.A. § 3 First (i); Elgin J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., supra at 33. The present Section 2 First, Second and Sixth were already part of the Railway Labor Act when the Norris-LaGuardia Act was passed. See Railway Labor Act § 2 First, Second, Fourth, 44 Stat. 577 (1926).

Section 8 of the Norris-LaGuardia Act states:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

Section 8 thus imposes two different requirements on one who seeks injunctive relief in a labor dispute. He must comply with all his legal obligations relevant to the dispute and, further, he must make every reasonable effort to settle the dispute by the methods enumerated. Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed.534 (1944). This is known as the "clean hands" provision of the Norris-LaGuardia Act. See 75 Cong.Rec. 5464 (1932).[10]

Since section 2 First, Second and Sixth of the Railway Labor Act were enacted before the Norris-LaGuardia Act, the rule of thumb upon which courts too often rely that the scope of earlier and more general legislation must always be reconsidered in the light of more specific provisions appearing in subsequent legislation does not help in deciding the present question. Moreover, the purpose of the Railway Labor Act, § 2 First, Second and Sixth and the purpose of the "clean hands" provision of the anti-injunction statute are not so inconsistent that it is impossible to accommodate one to the other.

In Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., supra, the Supreme Court held that under section 8 of the Norris-LaGuardia Act a railroad was not entitled to an injunction against a strike because the road had refused to submit to voluntary arbitration, an available method for settling the dispute there involved. In Butte A. & Pac. Ry. v. Brotherhood of Locomotive Firemen & Enginemen, 268 F.2d 54 (9 Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959) (alternative holding) the Court of Appeals for the Ninth Circuit held that an anti-strike injunction had to be denied under the Norris-LaGuardia Act because the railroad had abandoned the procedures of the Railway Labor Act for settling the major dispute in that case. Although both of these cases involved major disputes, we believe their treatment of the relationship between section 8 of the Norris-LaGuardia Act and the procedures set up by the Railway Labor Act for settling railway labor disputes is applicable to the case before us. See Butte A. & Pac. Ry. v. Brotherhood of Locomotive Firemen & Enginemen, supra, at n. 10. Cf. East Texas Motor Freight Lines v. International Bhd. of Teamsters, 163 F.2d 10 (5 Cir., 1947).[11]

10. The extent to which the Supreme Court has gone to enforce compliance with this provision of the Norris-LaGuardia Act is seen in Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944), in which the Court reversed an order granting injunctive relief to a complainant that had not complied with section 8, and this despite the fact that the acts complained of had caused violence.

11. In Chicago, R. I. & Pac. R. R. v. Switchmen's Union, 292 F.2d 61, 66 (2 Cir. 1961), certiorari denied 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806, it was sug-

Reading the relevant sections of the Railway Labor Act together with the "clean-hands" provision of the Norris-LaGuardia Act, and remembering that the dispute here is a minor dispute, we observe that an applicant for an injunction (1) must comply with all legal obligations required of it including the making of every reasonable effort to settle the dispute by conference and (2) must make every reasonable effort to settle the dispute by negotiation.[12] We are not certain whether the draftsmen intended different concepts by the words "conference" and "negotiation." See Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., supra, 321 U.S. at 61, 64 S.Ct. 413, 88 L.Ed. 534. However, we find that in applying these terms to the present controversy a distinction should be drawn between the duty to negotiate and the duty to confer. We construe "negotiation" to mean full-scale discussion and disputation. We construe "conferring" to mean activity of a similar type to negotiation but activity requiring a lesser output of time and of energy. We must make this distinction in the present case because of the nature of the issue which divides the parties. The basic dispute is whether the railroad under its existing agreement must *negotiate* before it reschedules the runs on the Ogdensburg Subdivision. If the railroad were required by statute to negotiate this issue before it submitted the dispute to the Adjustment Board, the result would be to require the railroad to negotiate with employee representatives over whether it should negotiate with them—a solution sounding a lot like an exercise in theoretical logic. We think in practice it would be virtually impossible for the parties to negotiate whether they would negotiate about the rescheduling without actually negotiating about the reschedul-

ing itself. Thus the brotherhoods would immediately achieve what they are only entitled to obtain after adjudication of the dispute by the Railroad Adjustment Board. Therefore, we hold that any requirement in section 8 of the Norris-LaGuardia Act that a railroad negotiate before obtaining an injunction is superseded by the statutory scheme in the Railway Labor Act that gives the Adjustment Board the power to decide whether there should be any negotiation at all between management and the brotherhoods.

But in minor disputes involving the scope of the managerial prerogative it must be that Section 2 First, Second and Sixth of the Railway Labor Act together with the Norris-LaGuardia Act impose some lesser duty on a railroad which seeks injunctive relief. Otherwise, in any minor dispute in which a railroad can contend that the question is one committed to managerial prerogative, the railroad will be tempted not to try to reach a private understanding with the representatives of its employees, a result inconsistent with one of the fundamental policies of the Railway Labor Act. See Brotherhood of R. R. Trainmen v. Toledo, P. & W., supra; Gunther v. San Diego & Ariz. E. Ry., 198 F.Supp. 402 (S.D.Cal.1961). Therefore, we hold that the relevant sections of the Railway Labor Act and the Norris-LaGuardia Act impose a duty upon a railroad, short of negotiation, to take some reasonable steps toward dispute settlement before it can obtain an anti-strike injunction. These lesser efforts are comprehended within the concept of "conferring." It is not easy to state exactly what the railroad must do in cases in which it must confer but need not negotiate. In each case the district judge must apply his experience and good sense to the

---

gested that a union which failed to comply with the Railway Labor Act, § 2 First, Second might be subject to an anti-strike injunction. The present case involves the converse situation. The railroad, perhaps, has failed to comply with those provisions, and, therefore, under § 8 of the Norris-LaGuardia Act, if its

failure is shown, it may be deprived of injunctive relief as long as it continues in its dereliction. See also Long Island R. R. v. Brotherhood of R. R. Trainmen, 185 F.Supp. 356 (E.D.N.Y.1960).

12. Mediation and voluntary arbitration are only relevant for major disputes.

specific circumstances of the case. However, certain minimum steps can be suggested for the usual case. Unfair surprise should be avoided whenever possible. The representatives of management should meet with those of labor. Each side should listen to the contentions of the other side and each side should explain its position clearly and honestly, but not for as long a time as is customary in full-scale bargaining. In short, men of good faith must in good faith get together in a sincere effort to resolve their differences. Cf. Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., at n. 18; Brotherhood of Ry., etc. Clerks v. Atlantic Coast L. R. R., 201 F.2d 36, 40 (4 Cir.), cert. denied, 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400 (1953); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777 (S.D.N.Y. 1958); Long Island R. R. v. Brotherhood of R. R. Trainmen, 185 F.Supp. 356 (E.D.N.Y. 1960). See also N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); N. L. R. B. v. Insurance Agents' International Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

■ In the present case the district court made no finding whether the management of the railroad made the good faith efforts which we have held to be a prerequisite to the obtaining by it of injunctive relief. The telegram that the railroad sent to the brotherhoods on September 15 stated "Conferences on this issue have not been held on the property with the [brotherhoods]." However, the railroad claimed at the hearing that its representatives met with representatives of the brotherhoods on September 9 and on September 16. We cannot determine from the record alone, without the benefit of observing the witnesses, whether the extent of these discussions met the standard we find is imposed by the Railway Labor Act.

If in fact the railroad has failed to take the steps required of it by the Railway Labor Act, it is not entitled to injunctive relief against the strike of its employees. Butte, A. & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54 (9 Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959). Therefore, we must remand the case for the district court to determine whether the railroad made reasonable efforts to settle this dispute in conference. See Pennsylvania R. R. v. Transport Workers Union, 178 F.Supp. 30 (E.D.Pa.1957) (Finding No. 15), appeal dismissed, 3 Cir., 278 F.2d 693 (1960). If the district court finds that the railroad has not done so, it should not issue the injunction until the railroad has perfected its right to such relief by compliance with its statutory obligation.

■ We believe that this disposition accommodates the purposes of both statutes. Except for the creation of the Railroad Adjustment Board, the policy behind both statutes is to facilitate the private settlement of labor disputes, see Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 58, 64 S.Ct. 413, 88 L.Ed. 534 (1944); Dwellington v. Thompson, 91 F.Supp. 787 (D.Mo.1950), aff'd sub nom. Rolfes v. Dwellington, 8 Cir., 198 F.2d 591 (1952). Furthermore, it cannot be said that this result subverts the jurisdiction of the National Railroad Adjustment Board because efforts privately to settle a dispute are required by the Railway Labor Act itself before submission of the dispute to the Adjustment Board.

■ Our decision is consistent with the Supreme Court's ruling in Brotherhood of R. R. Trainmen v. Chicago River & Ind. R. R., supra. In that opinion, especially at footnote 24, the Court concluded that because the Railway Labor Act created the Railroad Adjustment Board to decide the merits of minor disputes with finality, Section 8, like the other provisions of the Norris-LaGuardia Act, did not bar injunctive relief. But the Court did not address itself to the relationship of section 8 to those provisions of the Railway Labor Act which, without regard to the type of dispute involved, call for private confer-

ence in an effort to adjust the differences between the parties prior to governmental intervention. Therefore, that decision is not relevant to this part of our opinion. See discussion in Chicago R. I. & Pac. R. R. v. Switchmen's Union, supra, at 66, as to the scope of the decision in the Chicago River & Ind. R. R. case.[13]

Reversed and remanded for further proceedings not inconsistent with this opinion.

MARSHALL, Circuit Judge (dissenting).

With deference to my brothers, I deem the issues raised by the present case to be of such importance that a statement of my dissenting views is necessary. Because the "Section 6" and contract termination notices served by Rutland were also issued by most of the Class I railroads in the country, the factual pattern before us is of national importance. Much of what the majority says seems to me not only well put but also quite correct. I do not disagree with their treatment of the venue problem, with most of their general statements as to when a strike is legal or illegal under the Railway Labor Act, or with the assertion that a "labor dispute" is involved in this case. I strongly disagree, however, with the result they reach and would suggest that much of what they say is actually inconsistent with that result.

The majority correctly states the principal issue to be whether the dispute between the parties was "major" or "minor" under the Railway Labor Act. That proposition, however, is of such generality that it fails to pose the problems we must solve in any meaningful fashion. The legal dispute here involves two questions. First, what procedures must a party to a collective agreement in the railroad industry follow in order to terminate that agreement or any part thereof?[1] Second, the termination having been accomplished, under what circumstances may the parties resort to economic force?

My position, briefly summarized, is that Rutland voluntarily terminated so much of the collective agreement as might be said to govern the establishment of new runs and the merging or elimination of crew terminals and, then, believing that it could not secure what it desired through the normal processes of collective bargaining, violated the plain mandates of the Railroad Labor Act's major dispute procedures by unilaterally changing certain runs and terminals. This action should have been enjoined by the District Court. It does not follow that a strike to prevent such changes was justifiable, however, since, in my view at least, a remedy in the courts was available to the union and should have been resorted to. I would, therefore, have enjoined both Rutland and the Brotherhoods from engaging in self-help until exhaustion of the major dispute procedures.

The majority's conclusion is radically different. They hold explicitly that the agreement insofar as it dealt with the establishment of runs and terminals was not terminated and *sub silentio* that there was in fact no way in which to terminate it. They enjoin the union's use of economic force, therefore, pending exhaustion of the drawn-out minor dispute procedures and leave Rutland free to act unilaterally.

The words "major" and "minor" have no intrinsic legal significance. They are derived from the terminology of railway

---

13. The defendants also assert that the railroad is not entitled to an injunction because it has not complied with the nonstatutory duty of clean hands imposed on all who seek to invoke the jurisdiction of a court of equity. We believe that in the present case the scope of this non-statutory obligation is no greater than the statutory obligation imposed by Section 8 of the Norris-LaGuardia Act.

1. This seems to me to be the principal issue in the case since I would agree that if the relevant contractual provisions had not been terminated, the decision would be clearly governed by Brotherhood of R. Trainmen v. Chicago R. & I. Ry., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

industrial relations and are used judicially merely as a shorthand way of referring to a distinction incorporated in the structure of the Railway Labor Act. The statute, itself, however, does not use the words. The distinction is of legal significance solely because the Act establishes mutually exclusive mandatory procedures to be followed in resolving two different kinds of disputes.

Disputes involving grievances or contract interpretation questions are to be handled under Section 3 First.[2] Under that provision either party may submit the dispute to the appropriate Adjustment Board for a "final and binding" decision on the meaning of the contract. A strike over disputes properly submitted to the Adjustment Board may be enjoined in order to protect the Board's jurisdiction. Brotherhood of R. Trainmen v. Chicago River & Ind. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). And, in appropriate circumstances, the enjoining court may condition the strike injunction upon preservation of the *status quo* by management pending final adjudication by the Board. Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1435 (1960).[3]

But labor contracts in the railroad industry do not continue in force *in perpetuum* unless both parties so desire. Like many familiar agreements, they are subject to termination and change, a process which, when invoked by a party,[4] is characterized as a major dispute.

While the Act provides for compulsory arbitration of minor disputes, it leaves the resolution of major disputes to free collective bargaining and the use of economic force subject only to certain mandatory procedural requirements. Section 6[5] governs the procedure to be followed in changing agreements affecting working conditions. Any party desiring such a change must give 30 days written notice to the other party. Either party may then request the services of the Mediation Board or the Board may step in on its accord under Section 5.[6] Under Section 6 "rates of pay, rules, or working conditions shall not be altered" until final action by the Mediation Board under Section 5. Section 5 prohibits changes in "rates of pay, rules, or working conditions or established practices" until 30 days after the Board has notified the parties of the failure of its mediatory efforts. Section 10[7] empowers the President to establish an emergency board after the failure of mediation efforts and provides "no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose" until thirty days after the Board makes its report to the President. The legislative history indicates that when the rail unions and carriers agreed upon these provisions, the unions surrendered their right to strike pending exhaustion of major dispute procedures in exchange for a statutory provision restraining management from disturbing the *status quo*.[8] These "freeze"[9] or "cooling-off"[10] provisions have been held to be enforceable by the

2. 45 U.S.C.A. § 153 First.

3. Even though the majority believes a minor dispute is involved, it does not discuss the applicability of that decision to this case. Since I cannot agree this is a minor dispute, I shall also forgo discussion.

4. Presumably, a palpable breach of contract would be in violation of Section 6, see note 5, infra, and accompanying text, which requires 30 days written notice of an intended change in agreements and would therefore also create a major dispute. Cf. Railroad Yardmasters of America v. Pennsylvania R. Co., 224 F.2d 226 (3 Cir. 1955).

5. 45 U.S.C.A. § 156.

6. 45 U.S.C.A. § 155.

7. 45 U.S.C.A. § 160.

8. 67 Cong.Rec. 4524, 4588. See also comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 388 (1960).

9. Chicago, Rock Island & Pac. R. Co. v. Switchmen's Union, 292 F.2d 61, 66 (2 Cir. 1961).

10. 67 Cong.Rec. 4648, 4650.

courts. Grand International Brotherhood, etc. v. Morphy, 109 F.2d 576 (2 Cir., 1940); cert. denied 310 U.S. 635, 60 S.Ct. 1078, 84 L.Ed. 1404 (1940); Railroad Yardmasters v. Pennsylvania R. Co., 224 F.2d 226 (3 Cir., 1955).

No provision is made, however, for the compulsory resolution of substantive issues in major disputes, and the parties are free to resort to economic force after exhausting the procedures. Chicago River, supra, at fn. 24; Order of R. Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). See also Chicago, Rock Island and Pac. R. Co. v. Switchmen's Union, 292 F.2d 61 (2 Cir., 1961).

Within this legal framework, I fail to grasp how the factual pattern here presents the difficulties encountered by the majority. On November 2, 1959, Rutland served notice on the Brotherhoods "under our existing agreements and pursuant to the provisions of the Railway Labor Act" that it wanted a new contract, "effective January 1, 1960," which would in effect eliminate all "agreements, rules, regulations, interpretations and practices, however established," restricting the carrier's right to establish new runs and which would also explicitly "[e]stablish a rule to provide that * * * [t]he carrier shall have the right to establish, move, consolidate and abolish crew terminals * * * with the right to operate any * * * run * * * through established crew terminals." This was a 30 day notice of termination of all contractual provisions, explicit or implied, relating to the establishment of new runs and crew terminals. Rutland, by thus invoking Section 6 of the Act, and the termination provisions of the contracts, notified the Brotherhoods that it desired not only to terminate all restrictive provisions, practices and even all ambiguities as to the establishment of new runs but also that it wanted an explicit provision incorporated in a new agreement which would bestow upon it the absolute prerogative to change crew terminals. Rutland thereby voluntarily terminated the old agreement to this extent and invoked the major dispute procedures. Having invoked them, presumably it was bound by them.

Nevertheless, on September 8, 1960, before exhaustion of the major dispute procedures, Rutland announced that it intended unilaterally to establish new runs thereby changing certain crew terminals and to operate these runs through other established terminals. Since the major dispute procedures require that the carrier not change "working conditions," "established practices," or the "conditions out of which the dispute arose" until their exhaustion, Rutland's action was a plain violation of the Railway Labor Act.[11] The Brotherhoods called a strike

---

11. Arguably, these provisions might be read merely to mean that the collective agreement, with all its ambiguities, is to remain in force pending exhaustion of the major dispute procedures. Under that view, minor disputes could occur during that period and might involve the subject matter of the major dispute. In such a case, however, the union would still be free to strike over the issue after exhaustion of the major dispute procedures. A contrary holding would mean that ambiguous terms in a collective agreement would not be subject to change through collective bargaining until their meaning had been determined by the Adjustment Board. This would effectively lengthen the term of the contract beyond the intentions of the parties and would prohibit clarification through collective bargaining of those contractual provisions which need it most. It would, moreover, seem directly contrary to the intent of Section 6 which contemplates the proposal of changes in agreements whenever the parties desire and which contains no provisions restraining its use until an Adjustment Board decision has been rendered on the meaning of the old contract.

In any case, the preferable view is that changes in existing conditions which are the subject of a major dispute are forbidden whether or not they are arguably authorized by the collective agreement. The "freeze" provisions carefully avoid reference to the collective agreement, but emphasize "working conditions" (Section 6), "established practices" (Section 5), and "conditions out of which the dispute arose" (Section 10). This is in contrast to other parts of the Act, and, indeed, Section 6 itself, which refer

because of the unilateral changes announced by Rutland and were enjoined by the District Court.

In reviewing that action, I should have thought the principal question would be whether the union was free to strike against Rutland's illegal actions or whether the conduct of both parties in derogation of the major dispute procedures must be enjoined. On balance, I would have adopted the latter course both on the grounds that resort to the courts is generally preferable to this kind of self help [12] and on the further grounds that the "cooling off" policies of the major dispute procedures cannot be effectuated by allowing both parties simply to do away with the Act. These problems have become irrelevant, however, for the majority has concluded that the dispute is minor and must be resolved by an Adjustment Board determination of the meaning of the old agreement.

One reason asserted by the majority in support of this result seems to be that the Section 6 notice was not sufficiently broad to cover the matters in dispute. Two quotations from the notice are set out, apparently to demonstrate that it was intended only to do away with restrictions on the managerial prerogative to establish new runs. The majority then finds there are no *explicit* restrictions in the agreements, and, therefore, the Section 6 notice does not encompass this dispute. But if all this is true, why did Rutland serve notices pursuant to Section 6 and the various contracts in the

first place? Plainly, Rutland's purpose was to eliminate the ambiguities [13] in the agreement which the majority admits exist and in fact relies upon in sending this case to the Adjustment Board. I have not found any language in the statute or policy behind it which would prohibit or nullify this use of Section 6 in the manner suggested by the majority. I believe that clarification through collective bargaining of ambiguous contractual provisions is a most laudable purpose and should be encouraged rather than hampered by the courts. Moreover, the majority inexplicably ignores paragraph B(1) of the notice. That paragraph explicitly notifies the unions that Rutland seeks to "Establish a rule to provide that * * * 1. The Carrier shall have the right to establish, move, consolidate and abolish crew terminals * * * ". Surely a request to incorporate a comprehensive clause such as this must be said to change an ambiguous contract or an agreement containing no such explicit provision. That paragraph B(1) encompasses the dispute here is plainly evident, for the majority itself states the present "disagreement * * * [is] whether the management of the railroad had the right to * * * change crew terminals."

The majority states the "major-minor" distinction in the following fashion:

"It is a major dispute if the present agreements between the railroad and the brotherhoods contain express provisions contrary to the position

---

directly to the "agreement" when necessary. Moreover, the legislative history of the statute shows the "freeze" provisions were intended to enforce a "cooling off" period upon both labor and management in the railroad industry. See Note 10, supra. But this policy cannot be effectuated if management is allowed to take advantage of an ambiguous contract during the "freeze" to make changes in working conditions relating to the dispute. Such action is far more likely to warm up the dispute than cool it off.

12. Cf. Bakery Sales Drivers Local 33, v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 97 L.Ed. 79 (1948); Dorchy v. Kansas, 272

U.S. 306, 47 S.Ct. 86, 71 L.Ed. 248 (1926); but see Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

13. Existing ambiguities in a document cannot be cured by the continued silence of the parties. Obviously, therefore, Rutland's notice contemplated insertion of new provisions which would either affirmatively establish its prerogatives or would direct the Adjustment Board to follow a rule of construction which would prevent "interpretations" from infringing on these rights. Either course would require a new provision and a "change" in the existing agreements.

taken by the railroad or if the clear implication of these agreements is inconsistent with the railroad's proposals. It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous; * * *."

While this might be a correct statement of the law in the absence of a Section 6 notice, I would suggest that it is entirely erroneous once such a notice has been served. The majority opinion itself at one point concedes that major disputes commence with notice under Section 6. Moreover, it must be so, for under the Railway Labor Act a party is free to terminate an ambiguous contract in the hope of making it explicit without going to an Adjustment Board for a determination of its meaning. This is precisely what Rutland attempted to do. The reliance placed by Rutland and the majority upon the collective agreement is utterly inconsistent with the Section 6 notice, for Rutland intended by that notice to terminate and do away with the very same contractual provisions which are now so strenuously relied upon. And, the inconsistency of relying on these provisions is magnified since the notice was also based upon the termination clauses of the same agreements. I dare say that if this were a commercial contract with a 30 day termination provision, we would

not show such solicitude for one who invoked the termination procedures but later claimed the agreement was still in effect when the other party refused to meet his demands for a new contract.

But the significance of today's decision transcends the immediate and hopefully temporary problems of the Rutland Railroad and its employees. There is much in the majority opinion which implies there cannot be a major dispute if the relevant agreement contains an "ambiguous," but "clearly governing", provision, regardless of whether a Section 6 notice has been served. The quotation in the preceding paragraph seems to be to that effect. Along the same lines, reliance is placed upon "a number of cases involving disagreements similar to the one in the present case, [in which] courts have classified the disputes as minor." In all but one, however, there was no effective Section 6 notice and, therefore, no effective termination of the agreement.[14] The Railway Labor Act establishes a system of free collective bargaining, Section 6 being an integral part of that system. It is designed to allow either party to terminate an agreement, whether or not its meaning is clear, and bargain freely over new provisions subject only to certain procedural requirements. To hold that Section 6 is rendered inoperative if there is an ambiguous, but clearly governing, provision in the present agree-

14. In the Matter of Hudson & M. R. Co., 172 F.Supp. 329 (S.D.N.Y.1959), aff'd per curiam sub nom. Stichman v. General Grievance Comm. of the Bhd. of R. Trainmen, 267 F.2d 941 (2 Cir. 1959) cert. denied 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960) (proposal to amend the agreement withdrawn); Norfolk & P. B. L. R. v. Brotherhood of R. Trainmen, 248 F.2d 34 (4 Cir. 1957) cert. denied 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958) (no section 6 notice); Missouri-Kansas-Texas R. Co. v. Brotherhood of Locomotive Engineers, 266 F.2d 335 (5 Cir. 1959) rev'd on other grounds 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) (no section 6 notice); Baltimore & O. R. Co. v. United R. Workers, 271 F.2d 87 (2 Cir. 1959)

vacated and remanded on other grounds 364 U.S. 278, 80 S.Ct. 1609, 4 L.Ed.2d 1719 (1960) (no section 6 notice). Of the cases cited by the majority, only Hilbert v. Pennsylvania R. Co., 290 F.2d 881 (7 Cir. 1961) cert. denied 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1960) involved a Section 6 notice. I would submit that decision is erroneous.

The majority omits one decision involving a dispute "similar to the one in the present case." Order of R. Telegraphers v. Chicago & N. W. R. Co., 363 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). A Section 6 notice *was* involved in that case, and the Supreme Court found it to be a major dispute. See Note 18, infra, and accompanying text.

ments is to give it an effect precisely opposite to that intended and to deprive the parties of their right to bargain freely.

The dilemma created by the majority opinion is neatly posed when it says, "[T]he brotherhoods, upon the expiration of the existing agreements, may require the railroad to bargain" over the issues in dispute. But the only manner in which the existing agreements may "expire" is through notice pursuant to Section 6 by one of the parties, since none of these contracts contains a fixed expiration date.[15] Presumably, if the union had, on November 2, 1959, issued a Section 6 notice stating its desire to "eliminate all agreements, rules, regulations, interpretations and practices, however established, *allowing* the carrier to establish new runs *without the union's consent*" and to "establish a rule that the carrier shall *not* have the right to establish, move, consolidate crew terminals or to operate any runs through established crew terminals, *without the union's consent*," the majority's ruling would not vary.[16] Yet that is not significantly different from Order of R. Telegraphers v. Chicago & N. W. R. Co., 363 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), in which the Supreme Court held that a major dispute existed. While the majority is "not entirely certain" as to the

basis of that decision, I would submit the governing consideration must have been the Section 6 notice.[17] Otherwise, the case would have been indistinguishable from the Court's decision in Chicago River, supra, and all the other cases which have followed it. E. g. cases cited in note 14, supra. The most profitable inquiry for the majority is not how to distinguish Chicago and N. W. Ry. from this case but how to distinguish it from all the cases finding minor disputes. Viewed from that perspective, the "uncertainty" vanishes. In any case, Butte, A. & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54 (9 Cir. 1959), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959) is precisely on point and explicitly supports my view of the statute. I do not grasp how it may be disposed of simply by asserting the facts are different.[18] As for Hilbert v. Pennsylvania R. Co., 290 F.2d 881 (7 Cir. 1961), cert. denied, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed.2d 96 (1961), relied on by the majority, I would decline to follow it since it also seems based on the erroneous notion that Section 6 is inoperative when the existing agreement is ambiguous.

My reading of the statute and of subsequent judicial interpretations leads me to believe the majority has adopted a

15. Each contract provided that it was to remain in effect until changed in accordance with the Railway Labor Act. The the thrust of the majority's decision, therefore, is to eliminate the possibility of termination and to restrict the freedom of the parties to bargain collectively.

16. Since there is no explict grant to the carrier of these rights and there is an ambiguous, but clearly governing, provision, the majority's criteria for determining that a minor dispute exists would be satisfied. Surely the fact that the carrier gave the notice here does not serve to distinguish the two cases. That factor, if anything, would help the brotherhoods.

17. The majority is correct in stating that the magnitude of the effect upon working conditions is not the governing factor.

The statute itself does not use the words major and minor and, therefore, provides no standards for judging the magnitude. Adoption of such a test would engulf us in sterile inquiries such as when does a little dispute on a big railroad become a big dispute on a little railroad. On the one hand, it might tip the tactical balance by allowing management the protection of the equity arm of the federal courts so long as it bit off a little at a time and did not attempt to get everything in one gulp. On the other hand, a literal application of major and minor might encourage the unions to strike over every dispute simply to show how big it was.

18. Butte differs from our ruling in Stichman, note 14 supra, as to the effect of a withdrawal of a Section 6 notice. The notice here, however, was not withdrawn.

48

view which does much violence not only to our policies of free collective bargaining but also to traditional notions of freedom of contract. I must, therefore, dissent.