368 F.2d 50
 The LONG ISLAND RAIL ROAD COMPANY, Plaintiff-Appellee,
v.
SYSTEM FEDERATION NO. 156, American Federation of Labor, in
its own right and as representative of its members who are
also members of International Association of Machinists
(Lodge 754) et al., Defendants, Anthony F. D'Avanzo and A.
J. Russo, individually and as General Chairman and
Vice-Chairman, respectively, of Brotherhood Railway Carmen
of America (Longe 886), Defendants-Appellants.
 No. 69, Docket 30435.
 United States Court of Appeals Second Circuit.
 Argued Oct. 7, 1966.
Decided Oct. 31, 1966.
 
 John E. Trecartin (Edward G. Dougherty, New York City, on the brief), for defendants-appellants.
 James T. Gallagher, Jamaica, N.Y. (George M. Onken, Jamaica, N.Y., on the brief), for plaintiff-appellee.
 Before SMITH, HAYS and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge.
 
 
 1
 This is an appeal from a preliminary injunction granted by Judge Dooling in March 1966, after a ten-day hearing at the instance of plaintiff-appellee The Long Island Rail Road Company ('the Railroad'). The controversy grows out of a tangled labor situation at the Railroad, where one group of shop craft employees, Brotherhood Railway Carmen of America (Lodge 886) ('the Brotherhood'), has apparently been trying to bargain individually with the Railroad, rather than through an overall organization of shop craft unions. When the carmen were unable to achieve this goal, they resorted to various self-help measures; Judge Dooling's injunction prevented a resumption of such activities by the carmen and their leaders. Appellants are General Chairman and Vice-Chairman of the Brotherhood. We affirm the preliminary injunction.
 
 
 2
 The immediate cause of the Railroad's motion for an injunction was a slowdown by various carmen on February 8, 1966, which delayed many commuters. To understand the events leading to this unfortunate situation a description of bargaining patterns at the Railroad is necessary. The Railroad employs many men in various crafts, such as machinists, electrical workers, sheet metal workers and carmen. These shop craft employees are represented by several unions, of which the Brotherhood is one. Each local craft union is part of a national union; there are similar local unions at other major railroads in the United States. The national shop craft unions, as a composite, are known as Railway Employees Department, AFL-CIO; this national group deals with each railroad in the country through an organization known as System Federation. System Federation No. 156 ('System Federation') at the Railroad acts as the 'representative' under the Railway Labor Act ('the Act'), 45 U.S.C. 151 Sixth (1964), of the various shop craft employees employed by the Railroad. Each craft union on the Railroad has an elected General Chairman who is a member of System Federation. Prior to February 8, 1966, it had been the settled practice for the President and Secretary-Treasurer of System Federation and the General Chairman of each craft union to meet regularly with the Railroad's Director of Personnel to discuss and adjust various problems as part of the continuing collective bargaining relationship. In February 1966, there was in effect a labor agreement collectively bargained under the Act between the Railroad and System Federation. That agreement with its various amendments, embodied in several documents, governed rates of pay, rules and working conditions of employees. An agreement dated April 8, 1965, between the Railroad and System Federation on behalf of various employees including the carmen, provided for a moratorium until January 1, 1967, on the serving of notices under the Act requesting major changes in the agreement (section 6 notices).
 
 
 3
 In the period prior to February 1966, a power struggle affecting the bargaining structure was in process. In late 1964 and early 1965, attempts to oust the Brotherhood as the representative of carmen at the Railroad were made by both the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Railroad Division) and Harold J. Pryor, who was also General Chairman of another craft union at the Railroad, the Brotherhood of Railroad Trainmen. At the same time, within in the Brotherhood itself, a conflict developed between its charirman, Norman Artig, and its president, Anthony F. D'Avanzo. In the resulting internecine warfare, appellant D'Avanzo openly campaigned for Pryor to the representative of the carmen instead of the Brotherhood. In early 1965, an election was held in which none of the contending parties-- the Teamsters, Pryor, and the Brotherhood-- received a majority. Thereafter, Pryor and the Brotherhood settled their differences; Pryor agreed he would not seek a runoff election, and the eligibility requirement for running for office in the Brotherhood was waived so that D'Avanzo became available for election as General Chairman. In October 1965, the National Mediation Board certified the Brotherhood, functioning through the Railway Employees Department, as the representative of carmen at the Railroad. This meant essentially that there would be no change in their representation; locally, the carmen would still be represented by System Federation, acting in concert with the General Chairman of the Brotherhood. D'Avanzo thereafter succeeded Artig as General Chairman in January 1966.
 
 
 4
 On January 7, 1966, D'Avanzo requested monthly meetings between the Railroad's Director of Personnel and himself and a committee of the Brotherhood, and stated that he did not wish to attend the usual meetings between the Director and System Federation. The Director met with D'Avanzo two weeks later, explaining that he could not grant the request because System Federation represented the carmen. After a later meeting between the Director and D'Avanzo's committee, on February 1 the Director advised that consideration of rule changes or wage increases was barred until January 1, 1967, under the already mentioned national and local agreements. After another meeting a few days later ended in an impasse, D'Avanzo surmised out loud that if the Railroad would not discuss the carmen problems it would 'get a screwing.' D'Avanzo then advised his committee men to follow the rules strictly, with particular reference to use of a 'blue flag,' a customary symbol to prevent a train from being moved until the flag is removed by the person who placed it. On the morning of February 8, carmen placed blue flags on trains, with consequent immobilization of the cars and delay of trains of up to sixty-nine minutes. In addition, delays were caused by the refusal of carmen to hook up air and steam hoses between engines and head cars.
 
 
 5
 Judge Dooling found that the union 'blue-flagged' the trains not for safety reasons but to coerce the Railroad into bypassing System Federation and negotiating with the Brotherhood alone as representative of the carmen. As to the coupling, although there has been controversy over the carmen's responsibility for this job, it had been their practice to perform it; Judge Dooling found that their refusal to couple the hoses was a reinterpretation of the collective bargaining agreement. The trial judge also found that System Federation has not taken a definite position on whether the Brotherhood is free alone to represent the carmen; the Brotherhood Railway Carmen, AFL-CIO (the national organization) has neither authorized nor repudiated the activities of D'Avanzo's group. The district court further found that resumption of the blue flag activities and work stoppages would irreparably damage age the Railroad, and that appellants have not exerted any reasonable effort either to maintain existing agreements with the Railroad or to settle disputes arising out of the application of the agreements, nor have they resorted to the procedures prescribed in the Act. Appellants, among others, were enjoined pending trial from causing any acts which effect an intended delay in the Railroad's scheduled rail service.
 
 
 6
 Appellants' broadside attack upon the issuance of the injunction is entirely misplaced. Recognizing that the Act establishes procedures for settlement of 'major' and 'monor' disputes, see Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381 (1960), appellants offer no colorable excuse for their complete disregard of these mandates. One of their principal claims is that the Railroad's alternative reliance on the contractual moratorium on instituting 'major' dispute procedures is inconsistent with its allegation that appellants failed to utilize these procedures. However, appellants cannot justify their short-circuiting of the Act by showing an inconsistency in the Railroad's complaint, so long as appellants' conduct was a flagrant violation under the Act of the 'duth of all carriers, (and) their * * * employees to exert every reasonable effort to make and maintain agreements * * * and to settle all disputes * * * in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.' 45 U.S.C. 152 First (1964). Since the carmen did not utilize the procedures of the Act for monor or major disputes-- indeed did not even initiate them-- the union's resort to self-help was unwarranted. See Brotherhood of Ry. Clerks v. Florida E. Coast Ry., 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966); Flight Eng'rs Ass'n v. Eastern Air Lines, Inc., 208 F.Supp. 182 (S.D.N.Y.), aff'd per curiam, 307 F.2d 510 (2d Cir. 1962), cert. denied, 372 U.S. 945, 83 S.Ct. 934, 9 L.Ed.2d 970 (1963).
 
 
 7
 Appellants also argue that the Railroad refused to negotiate with them, thus breaching its duties under the Act and leaving the carmen free to compel compliance with the Act by self-help. It is true that the Norris-LaGuardia Act, 29 U.S.C. 108 (1964), imposes a requirement of 'clean hands' on those seeking injunctive relief in a labor dispute. Brotherhood of R. R. Trainmen v. Toledo, P. & W.R.R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944). In the past, we have remanded an injunction issued to enforce compliance with the Act when the district court had made no finding on the good faith efforts of the railroad. Rutland Ry. v. Brotherhood of Locomotive Eng'rs, 307 F.2d 21, 41 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963). In the present case, however, Judge Dooling wrote a separate opinion on this issue, in which he concluded that 'to date the procedures of Lodge 886 have been so abrupt and disregardful of its Railway Labor Act duties, and its definition of its own role and relation to the other labor organizations so uncertain, that it cannot now be said that the plaintiff has to date failed in its reciprocal responsibilities.' With this appraisal we agree. Judge Dooling also stated that future failure by the Railroad to perform its duties under the Act could lead to dissolution of the injunction.
 
 
 8
 Appellants also contend that the Norris-LaGuardia Act, supra, deprived the court below of the power to issue an injunction. This argument is sufficiently dealt with in Rutland Ry. v. Brotherhood of Locomotive Eng'rs,supra at 37-38. Finally, appellants complain that the injunction is incomprehensible and is too broad, and requires noncompliance with a safety (blue flag) rule. However, the injunction only prohibits use of that rule to effect an intended delay in rail service. The injunction is sound in all other respects.
 
 
 9
 The order is affirmed.