The **LONG ISLAND RAIL ROAD COMPANY, Plaintiff,**

v.

**SYSTEM FEDERATION NO. 156, AMERICAN FEDERATION OF LABOR** * * * **Anthony F. D'Avanzo and A. J. Russo, individually and as General Chairman, and Vice-Chairman, respectively, of Brotherhood Railway Carmen of America (Lodge 886), J. P. Torre, et al., individually and as members of the Local Protection Board Brotherhood Railway Carmen of America (Queens Lodge 886), Defendants.**

**No. 68 C 764.**

United States District Court
E. D. New York.

Aug. 16, 1968.

George M. Onken, Jamaica, N. Y., for plaintiff, by James T. Gallagher, Jamaica, N. Y., of counsel.

John E. Trecartin, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

JUDD, District Judge.

After hearing evidence on plaintiff's motion for a preliminary injunction, the Court, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The Court has jurisdiction of the action as one arising under the Constitution and Laws of the United States, and particularly the Railway Labor Act, an Act of Congress relating to commerce, and in which the amount in controversy exceeds $10,000.00.

2. At all times hereinafter mentioned, the plaintiff was and is a railroad corporation organized and existing under the laws of the State of New York. Plaintiff is a subsidiary corporation of the Metropolitan Commuter Transportation Authority.

3. Plaintiff's principal place of business is Jamaica Station, Jamaica, in the Borough and County of Queens, City and State of New York. Plaintiff is a Class I steam railroad engaged in business as a common carrier for hire in the transportation of passengers and property in interstate and foreign commerce, subject to the Interstate Commerce Act, and also in intrastate commerce within the State of New York, and is a "carrier" within the meaning of the Railway Labor Act.

4. Plaintiff railroad is used by the residents of Nassau and Suffolk Counties for daily transportation in and out of New York City and is used by residents of the Boroughs of Queens, Brooklyn and Manhattan.

5. Each weekday, plaintiff transports approximately 260,000 passengers, including 180,000 one-way trips made by approximately 90,000 persons who regularly commute between their homes and their places of business in the City of New York.

6. (a) The Brotherhood of Railway Carmen of America, Lodge 886 (hereinafter referred to as "Carmen" or the "union") is the representative of about 889 carmen employed in the Maintenance of Equipment Department of the plaintiff.

(b) The defendants Anthony F. D'Avanzo and A. J. Russo are the General Chairman and Vice-Chairman, respectively, of Carmen.

(c) The defendants, J. P. Torre, A. W. Martino, G. Schneider, G. J. Mastanduno, J. R. McGovern, N. M. Rossi, H. Favichia, J. N. Antonacci, J. Di-Dominico, A. J. Malena, R. C. Summa, B. Varricchio, S. V. Marzec, C. M. Johnson, J. J. Dombrowski, R. Kern, Raymond McMahon, P. S. Mazzeo, V. N. DiGenova, J. A. Profeta, J. H. Elbert, and J. V. Mentel are members of the Local Protective Board Brotherhood of Railway Carmen of America (Lodge 886).

7. There is presently in effect a collectively bargained labor Agreement entered into in accordance with the terms of the Railway Labor Act between the plaintiff and defendant Carmen. The Agreement governs rates of pay, rules, and working conditions of employees and is evidenced by a printed pamphlet effective July 1, 1949 as to rules and effective February 1, 1951 as to rates of pay, and by a series of amendatory agreements made on and between March 26, 1952 and February 29, 1968.

8. Plaintiff owns and operates the Dunton Electric Car Shop at which 217 employees are assigned primarily for the inspection of and performing minor repairs on multiple-unit electric cars.

9. Of the 217 employees at the Dunton Shop, 96 are members of the Carmen. The remainder are members of other crafts, including electricians and supervisors.

10. The Dunton Shop currently operates two tricks, five days a week, from Monday through Friday. The first shift is from 12:01 A.M. to 8:01 A.M., and performs only repairs; the second

shift is from 8:30 A.M. to 4:30 P.M. A limited work force does repairs from 8:30 A.M. to 4:30 P.M. on Saturdays.

11. Under the regulations of the Interstate Commerce Commission, all multiple-unit (M. U.) electric cars must be inspected every thirty days. Such M. U. cars may not be used in passenger service after the time for inspection has passed. .

12. Prior to July 25, 1968, the Dunton Shop inspected an average of approximately 19.5 M. U. cars per day, and completed minor repairs on an additonal 21 M. U. cars per day.

13. On July 22, 1968, Mr. F. A. Danahy, Chief Mechanical Officer of the plaintiff, informed Mr. D'Avanzo of the Carmen by letter that the railroad intended to institute a three-trick, seven-day operation at the Dunton Electric Car Shop beginning August 19, 1968. He requested that Mr. D'Avanzo meet with him during the week of August 5, 1968 in order to discuss the starting times.

14. At the regular meeting of Lodge 886 of the Carmen on July 23, 1968, Chairman D'Avanzo expressed his belief that new members of the railroad management intended to reduce the labor force. Defendant McGovern, a member of the Local Protective Board of Lodge 886, stated that:

"we should inform our people at all points to give up all overtime except established jobs."

15. At the regular meeting of Lodge 886 of the Carmen on August 6, 1968, Vice-Chairman Torre stated that:

"We have a contract to fulfill and that we work 8 hours a day."

16. From July 26th through August 13th the Dunton Shop completed inspections of only 10 M. U. cars per day, and there were also sharp reductions in the number of cars on which minor repairs were completed.

17. The railroad requires 718 M. U. cars for its weekday service, and even before July 26th was usually short of the required number of serviceable cars.

18. As a result of the failure of the Dunton Shop to release the normal number of cars inspected or repaired, the railroad was required to shorten some trains, and has been required to cancel regularly scheduled trains on every weekday since August 1st.

19. On August 12, 1968, the railroad had to cancel 27 morning trains and 24 evening trains.

20. On the morning of August 13, 1968, the railroad had to cancel 32 trains, which would normally have carried about 22,000 passengers.

21. Under the collective labor agreements with operating unions, the railroad is required to pay the crews of the cancelled trains, even though work is not available for them.

22. Prior to July 25, 1968, the railroad from time to time asked members of the union to work overtime and had no substantial difficulty in obtaining men to do overtime work.

23. The Agreement with the Carmen provides for overtime to be distributed equally so far as practicable among employees and a 1959 amendment specifies that when a Supervisor notifies the Local Committeeman of the number of employees needed to work on a specified job,

"the Local Committee will arrange to supply the necessary qualified employees."

In practice, the union has prepared lists of men entitled to overtime work.

24. Overtime work is compensated at time and a half. The average union member would earn approximately $50.-00 per eight-hour shift of overtime work.

25. Since July 25, 1968, the railroad has been unable to obtain a single member of the union to perform overtime work.

26. Requests by the railroad to the union to supply men for overtime work at the Dunton Shop have been made on several occasions during that period, and particularly on July 26th, August 2nd, August 9th, and August 12th.

27. On Sunday, August 11, 1968, Howard Kallman, Master Mechanic of the railroad, assembled a group of 35 supervisors and other railroad employees to work a special shift in the Dunton Shop between 9:00 A.M. and 4:25 P.M. They were able to prepare 17 cars for service and completed four inspections.

28. The personnel at the Dunton Shop is the same number as a year ago, except for one unfilled position, resulting from the retirement of a worker in early 1968.

29. Provision for paid sick leave was added to the Agreement between the railroad and the union, effective February 29, 1968. Currently four or five men are absent on sick leave each day.

30. Railroad supervisors have power to overrule the judgment of union members on compliance with I.C.C. inspection requirements and completion of repairs.

31. There has been no instance between July 26th and August 14th in which a supervisor released a car that a union member refused to release.

32. The union has insisted that the men are performing their jobs properly and that there is no labor dispute.

33. Before signing the order to show cause which instituted the hearings on the motion for preliminary injunction, the Court directed the parties to confer, which they did. Two recesses were taken in the hearings in hope that the parties would find means to restore the prior level of production at the Dunton Shop, but without any apparent results.

34. There were occasional shortages of parts, materials, tools and equipment at the Dunton Shop at all times herein material, both before and after July 25, 1968.

35. Correspondence concerning the proposed three-trick, seven-day operation at the Dunton Shop continued during the hearings. A meeting between Mr. D'Avanzo and Mr. Van Wart, the railroad's new Director of Personnel Relations, has been scheduled for August 28th. Mr. D'Avanzo has also served notice that he considers the proposal to be a change in working conditions and subject to the provisions of Section 6 of the Railway Labor Act (45 U.S.C. Section 156), which provides for action by the National Mediation Board if the matter is not resolved by the parties.

36. On August 13, 1968, the railroad posted a notice at the Dunton Shop, at the request of the Court, rescinding the proposed August 19th starting date of the seven-day, three-trick operation, pending the outcome of the conferences described above.

37. Another dispute is still pending between the union and the railroad, although not related to the Dunton Shop. During June, 1968, the plaintiff published a notice that 15 painters' jobs and 3 upholsterers' jobs would be abolished on July 3, 1968. The Carmen threatened to strike on July 3rd, then delayed the strike to July 8th. On July 5, 1968, this Court refused to issue a temporary restraining order, but granted an order to show cause. After the parties agreed to maintain the status quo pending a determination by the National Mediation Board, the motion for the restraining order was adjourned by stipulation to August 7th and subsequently to August 21st. (No. 68 C 688)

38. In or about 1968, there were three major changes in management personnel of the railroad. Arthur Van Wart, the Director of Personnel Relations, F. A. Danahy, the Chief Mechanical Officer, and B. W. Curry, Jr., Vice President for Administration and Finance, were new personnel. Mr. Van Wart, appointed June 1, 1968, became the superior of Howard J. Bellis, the Director of Personnel, who had handled negotiations with the union. Mr. D'Avanzo stated the three new men "have but one intention and that is to reduce the labor force". This charge was made at the meeting of Lodge 886 held on July 23, 1968. The truth or falsity of the charge is not material in this proceeding; the making of the charge has a bearing on the reasons for the decline in production which ensued.

39. The Vice-Chairman of the union testified that:

"We have been taking it, whatever it is, and the men are just sick and tired."

40. The union members have been working hard, though not completing as many cars.

41. The decline in the number of cars inspected and repaired at the Dunton Shop has been caused in substantial part by the desire of union members to retaliate against the railroad for real or supposed grievances.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction to entertain plaintiff's action and its application for the equitable relief of injunction. Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962); Brotherhood of Railway Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

■ 2. The railroad complied with its obligation to confer in good faith with the union prior to seeking injunctive relief. Rutland Ry. Corp., supra, 307 F.2d at 40–41; Railway Labor Act Section 2 First, Second and Sixth.

3. The defendant representatives of the Carmen and the members of the Carmen have not exerted reasonable efforts to maintain existing agreements concerning rules and working conditions or to settle the disputes between them and the plaintiff arising out of the interpretation or application of the agreement between them. They have not resorted to the procedures of the Railway Labor Act and have not conferred in good faith with the plaintiff to resolve their differences.

4. The defendants were and are required to process any and all claims and grievances as labor disputes under the Railway Labor Act.

5. The defendants were guilty of conduct forbidden by law in instigating a concerted refusal to work overtime by all members of the Carmen working at Dunton Shop.

6. The defendants were guilty of conduct forbidden by law in instigating and sanctioning a change in working methods different from that in existence prior to July 26, 1968.

7. The plaintiff will suffer irreparable injury from a continuance of the concerted refusal to work overtime and the change in working methods instituted by the Carmen on July 26, 1968. Plaintiff has no adequate remedy at law.

8. Plaintiff is entitled to injunctive relief against the defendants.

## OPINION

This action, by a railroad against a brotherhood of non-operating employees, seeks preliminary and permanent injunctions against a slowdown by car repairmen. In hearings on plaintiff's motion for a preliminary injunction, the Court has heard sixteen witnesses for the railroad, and four witnesses for the union.

The evidence clearly shows that there has been a sharp decline in the output of the shop where M. U. cars are inspected and repaired, and that this decline has caused cancellations of numerous passenger trains, with resultant loss to the railroad and inconvenience to the public. The Court must decide its power to issue an injunction, and whether plaintiff has shown acts by the defendant union which justify the issuance of an injunction.

The Railway Labor Act provides elaborate machinery for the resolution of disputes and grievances between unions and management. The Act forbids any strike until the machinery of mediation, adjustment and arbitration provided for under the Act has been exhausted. 45 U.S.C.A. Section 151 et seq.

The general purposes of the Act include "(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein" and "(4) to provide for the prompt and orderly settlement of all disputes * * *" 45 U.S.C.A. Section 151a.

■ It is established law that the Norris-LaGuardia Act does not forbid the issuance of an injunction against a strike which is called in violation of the Railway Labor Act, Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21 (2d Cir. 1962). There is also a recent precedent for an injunction against a slowdown on the Long Island Railroad. Long Island Railroad Co. v. System Federation No. 156, 368 F.2d 50 (2d Cir. 1966).

The union asserts that there is no labor dispute, and that the decline in production at the Dunton Shop is not the result of any action or omission on its part.

■ The existence of a labor dispute is apparent from the evidence. In addition to the question of layoffs of painters and upholsterers presently before the Court in another case, there is an active dispute concerning management's right to institute a three-trick, seven-day week at the Dunton Shop. The evidence also showed concern by union members about possible reductions in work-force by new officials of the railroad, questions concerning the responsibility for certifying that inspections and repairs had been completed, resentment at disciplinary charges filed during the early stages of the slowdown, and complaints about failure to supply adequate materials, tools and equipment. The trend has been to broaden the scope of subjects about which workers and railroads may bargain collectively. Detroit & Toledo Shore Line R. Co. v. Brotherhood of Locomotive Firemen and Enginemen, 267 F.Supp. 572, 575 (N.D. Ohio, 1967). The Railway Labor Act contemplates that in every dispute, "Men of good faith must in good faith get together in a sincere effort to resolve their differences." Rutland Railway Corp. v. Brotherhood etc., 307 F.2d at 41. Whether a dispute is major or minor, or is claimed not to be a labor dispute at all, an injunction may issue, to effectuate the purposes of the Railway Labor Act. Long Island Railroad Co. v. Brotherhood of Locomotive Engineers

(E.D.N.Y. June 20, 1968 – 68 C 418 – per Mishler, J.).

The cancellation of trains has clearly been aggravated by the concerted and repeated refusal of all members of the union to perform any overtime work, when cars were awaiting inspection and repair. Such refusal after August 7, 1968, may have constituted a violation of this Court's temporary restraining order. It clearly constituted a change in the practice existing prior to July 26, 1968, and a form of self-help designed to bring pressure against the railroad and to defeat the purposes of the Railway Labor Act.

Whether the decline in production of the Dunton Shop after July 25th results from action of the union is a more difficult question. Instances of slow performance of jobs, on the first night of the slowdown, were apparently not repeated. Destruction or loss of tools and equipment was not traced to the union.

The railroad argues that the sharp and sudden decline in output in the Dunton Shop is itself evidence of a deliberate slowdown. The union attributes the decline to a variety of other sources, such as a shortage of tools and parts, failure to replace men on sick leave and vacation, and additional emphasis by representatives of the Interstate Commerce Commission on full performance of the steps necessary in each inspection and repair. The union did not establish, however, that any one of these, or all together, could account for the sudden, sustained drop in output that took place on July 26th and has continued ever since.

The Court need not be blind to the obvious. It is difficult to prove a slowdown, when the workers assert that they are doing their work, and the supervisor admits that the men are working hard. However, a sudden, sharp, continued drop in output is not likely to be a mere coincidence. Given the fact that the union members were disturbed about a number of matters, described above, and considering the statement by the Vice-

Chairman of the union that "the men are sick and tired," this Court is persuaded that the union members have determined to keep the number of completed cars as low as they can without being brought up on disciplinary charges.

■ This is enough to require injunctive relief. If any dispute should develop concerning the union's compliance with the injunction, either party may apply to the court for the appointment of an impartial expert to ascertain and report whether any conduct of the union is at fault.

Due to the indefiniteness of the union's grievances, it is not clear whether the differences between the parties may best be settled by the National Mediation Board, the National Railroad Adjustment Board, or a special adjustment board as provided by 45 U.S.C.A. Section 153 Second. It need not be decided which board is appropriate or whether this dispute is major or minor in nature. Rutland Railway Corp. v. Brotherhood etc., 307 F.2d at 33. The machinery is available, to be utilized by the parties.

### CONCLUSION

The Court has found that the concerted refusal of union members to do any overtime work should be enjoined, and that the decline in production constitutes an improper slowdown. But it has not found that the management of the railroad is blameless in its conduct of labor relations.

■ The injunction which is being granted will be conditioned on the railroad not putting the three-trick, seven-day operation into effect until the procedures of the Railway Labor Act have been completed, and will be without prejudice to any rights of the union upon the completion of said procedures. Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960).

■ The primary consideration in this case is neither the railroad's interest, nor the union's interest, but the public need for a reliable, safe, and convenient transportation service.

■ Any matters which may cause grievances or fears on the part of union members may be corrected by the methods provided in the collective bargaining Agreement and the Railway Labor Act. The stability of our society demands that every group use lawful methods for relief of grievances before resorting to actions which violate constitutional or statutory obligations. A slowdown is a form of civil disobedience. When it is brought to the attention of the Court, the Court must enforce the law. Union members, like other citizens, are expected to comply with court orders.

Paying workmen overtime to cure the effect of a slowdown may seem like a reward for misconduct. There is no other alternative available. It is clear that, even if full production were immediately resumed at the Dunton Shop, it would take many days of overtime work to clean up the backlog, and provide the railroad with adequate M. U. cars for its passenger service in the electrified zone.

The Court has modified and signed the injunction order submitted after the hearing.